No. 44,168

Russell Hays, *Appellee*, v. Junius Underwood, Administrator *de bonis non cum testamento annexo* of the Estate of Dean Park, Deceased, *Appellant*. (Formerly Halcolene Stroeter, Executrix of the Estate of Dean Park, Deceased.)

(411 P. 2d 717)

Opinion filed March 5, 1966.

*Charles S. Fisher, Jr.*, of Topeka, argued the cause, and *O. B. Eidson, Philip H. Lewis, James W. Porter, Peter F. Caldwell, William G. Haynes, Roscoe E. Long, R. Austin Nothern* and *Brock R. Snyder*, all of Topeka, were with him on the briefs for the appellant.

*George K. Melvin*, of Lawrence, argued the cause and was on the briefs for the appellee.

The opinion of the court was delivered by

Hatcher, C.: This controversy stems from a claim filed against a decedent's estate based on an alleged breach of contract.

Dean Park died testate on September 24, 1959. His wife, Halcolene Stroeter Park, was the sole legatee under his will.

For a number of years prior to his death Dean Park was engaged in the oil production business. Park had an oil and gas lease located on the west 110 acres of a 160 acre farm in Douglas County owned by Edwin Early. Russell Hays, the claimant, owned an oil and gas lease on the east 50 acres of the Early Farm.

In his claim filed in the probate court claimant alleged that he and the decedent had entered into a written agreement on February 16, 1959, "to provide for an imput [sic—input] well" to be used jointly by appellee and decedent for the purpose of disposing of the brine produced from the wells located on their respective leases; that under the terms of the written agreement decedent was to convert an old stripper well located on decedent's lease into an input or disposal well, and plaintiff was to give decedent a drilling location on the line between the two leases on which to drill a well to replace the loss of the stripper well which was to be converted. The claimant contends that the agreement was written by him in longhand in Dean Park's living room and that Park made a copy thereof. The agreement which was attached to the claim reads as follows:

"~~DISPOSAL~~ IMPUT WELL AGREEMENT   2-16-59

"1. I give you choice of any location on line to replace loss of joint disposal well.

"2. You convert well and get joint repressuring permit from state.

"3. If location you pick does not pay out & pay for conversion in 32½ yrs. time, then cost of imput well shall be shared on basis of ~~wells~~ produced brine from on respective leases.

"HAYS-EARLY

"x_____

DEAN PARK

"PARK-EARLY                    x_____

"2 copies"

The claim further alleged that plaintiff did assign a drilling location to the decedent and that a well was drilled thereon, but that decedent did not convert or provide the joint input or disposal well and that by reason thereof claimant had a claim against the estate in the amount of $10,000.00. The claim also alleged that plaintiff owed the estate the sum of $2,000.00, with interest at six percent, from October 1, 1959, on a promissory note which plaintiff gave to decedent on August 1, 1959, in payment for the transfer of an oil and gas lease and that this indebtedness should be considered as an offset against plaintiff's claim.

The answer, in substance, denied that the alleged contract was genuine or that it had been executed by the decedent; contended that the purported signature of the decedent on the alleged agreement was a forgery, and that the assignment of the location on plaintiff's lease was not made pursuant to the contract, but that the assignment by plaintiff and subsequent drilling by decedent was done at the request of plaintiff because he had failed and neglected to develop his lease and wanted decedent to drill thereon in order to avoid a forfeiture. It was further contended that the alleged agreement was so incomplete and uncertain that it was unenforceable.

The claim was transferred to the district court and tried to a jury. In answer to a special question the jury found that the alleged contract bore the signature of the decedent and fixed the amount of plaintiff's recovery at $8,100.00.

The representative of the decedent's estate has appealed from the verdict and judgment rendered thereon.

Appellant first contends that the trial court erred in overruling its demurrer to appellee's evidence and its motion for a directed verdict because the alleged agreement is so indefinite and uncertain that it cannot be enforced.

The appellant suggests that whether a contract shows the requisite certainty and completeness essential to its validity is a question of law to be determined by the court. We adhere to the rule that whether a written instrument or undisputed facts establish the existence and the terms of a contract are questions of law for the court's determination. (*Kittel v. Krause,* 185 Kan. 681, 347 P. 2d 269.) However, where the evidence pertaining to the existence of a contract or the terms thereof is conflicting or admits of more than one inference a question is presented for the trier of facts. (*Royer v. Silo Co.,* 99 Kan. 309, 161 Pac. 654.)

In considering the above rules for what importance they may have in determining the issues before us for consideration, it should be understood that the sufficiency of the written instrument to create a binding agreement was not specifically challenged until the appellee's evidence, much of which was not controverted, was before the court.

The appellant further calls our attention to the generally recognized rule that in order for an agreement to be binding it must be sufficiently definite as to its terms and requirements as to enable a

court to determine what acts are to be performed and when performance is complete. The court must be able to fix definitely the legal liability of the party. We have adhered to this general rule. (*Nichols v. Coppock,* 124 Kan. 652, 261 Pac. 574; *Stratford v. Petticord,* 108 Kan. 775, 197 Pac. 221; *Price v. Weisner,* 83 Kan. 343, 111 Pac. 439.)

Again, however, the courts generally have so far deviated from the general rule and set up so many exceptions that it is an exceptional case where the rule can be followed as a complete guide to the determination of the sufficiency and definiteness of the terms of a contract.

The courts will so construe an instrument as to carry the intention of the parties into effect where possible. (*Gas Co. v. Altoona,* 79 Kan. 466, 100 Pac. 50.) The law will favor upholding a contract against a claim of uncertainty where one of the parties has performed his part of the contract. A contract may contain imperfections or be lacking in detail but it will not be held void for uncertainty if the court, under the recognized rules of construction, can ascertain the terms and conditions by which the parties intended to be bound. (*Bonesteel v. White,* 127 Kan. 843, 275 Pac. 163.) It matters not that the court must resort to extrinsic facts to ascertain the exact meaning of the language used. (*Clark v. Larkin,* 172 Kan. 284, 239 P. 2d 970; *Steele v. Nelson,* 139 Kan. 559, 32 P. 2d 253.) In *Beech Aircraft Corporation v. Ross,* (CA 10 Kan.) 155 F. 2d 615, it was said at page 617:

"The courts will not permit a contract to fail for the want of a formal detail, which can be supplied within the frame work of the contract itself. . . ." (A general discussion of the rule on definiteness and certainty will be found in 17 Am. Jur. 2d, Contracts, § 75, *et seq.*)

The appellant specifically contends that the written instrument is indefinite in three particulars, *i. e.* (1) it fails to specify what kind of a well was to be created for the parties' joint use; (2) the phrase, "shared on basis of produced brine from on respective leases," is not clear, and (3) the parties are not identified in the body of the instrument.

We find no merit in the appellant's contention. The written instrument and the testimony of the appellee left no question but that the parties were interested in a well into which they could "put" or "dispose" of the salt water which was produced with the oil. The well was also to be used for repressuring because such a permit was

to be obtained from the state. The parties desired the well to serve two purposes—a well in which to dispose of the salt water and also a well to be used for repressuring. As the well was to serve a dual purpose it mattered little by which name it was designated in the written instrument.

If the phrase, "cost of imput well shall be shared on the basis of produced brine from on respective leases," is indefinite, the indefiniteness was cured by performance as the well was drilled and "paid out" for the drilling and conversion, removing the contingency which is claimed to be indefinite.

We find no difficulty in identifying the parties to the agreement. The appellee testified that he drew the agreement in Dean Park's living room and that Park made a copy. The "I" therefore represented the appellee and the "you" represented Park. The appellee assigned the drilling location to Park which performance further identified the "I" referred to in the contract.

Appellant attempts to inject a new issue into the case on this appeal. Appellant suggests that the court is presented with a document containing material alterations which are not explained by the record and under the facts and circumstances appellee has the burden of explaining the alterations and the time when they were made. We note that the question was not raised in the trial court. We have stated on numerous occasions that this court will not consider questions not presented to or determined by the trial court. Some of the more recent cases in which the matter was considered are *Ackerman v. Tudor,* 178 Kan. 290, 286 P. 2d 178; *Watkins Co. v. Hanson,* 185 Kan. 758, 347 P. 2d 447; *Karle v. Board of County Commissioners,* 188 Kan. 800, 805, 366 P. 2d 241, and *Rexroad v. Kansas Power & Light Co.,* 192 Kan. 343, 388 P. 2d 832.

The appellant contends that:

"The Court erred in overruling the Demurrer and Motion for Directed Verdict of the defendant, by reason of the fact that the evidence of the plaintiff did not disclose that well No. 6 produced a sufficient quantity of oil to pay for the cost of the same."

This contention presents nothing but a controverted question of fact. It would serve no useful purpose to burden this opinion with the numerous methods of calculation by which the jury could have found that the No. 6 well, drilled on the assigned location, produced ample oil the first year to pay for drilling and equipping the well and converting one of the wells to a joint input and disposal well.

The appellant objects to appellee's evidence as to the amount of oil produced as resulting in conjecture and speculation. It must be conceded that the amount of oil produced in one year from well No. 6 could not be definitely computed. The appellee did not have this burden. He needed only to prove that the amount produced exceeded the value covered by the agreement. It was no fault of appellee if Park saw fit to commingle the production from well No. 6 with the production from other wells so that the exact amount produced from well No. 6 could not be determined.

The appellant next contends that it was error for the court to refuse to allow testimony relative to Dean Park's business habits and method of conducting business.

Appellant's chief defense in the case was based on the allegation that Park's signature on the contract was a forgery. When an objection to a direct question as to how Park conducted his business transactions was sustained, appellant established the fact that Parks had a typewriter. The court sustained an objection to a further question as to whether Park, in his business dealings, typed his contracts as being incompetent and immaterial.

This court in *In re Estate of Curtis*, 193 Kan. 431, 394 P. 2d 59, approved the rule stated in 1 Jones Evidence, § 154 (5th ed.), p. 275, as follows:

"If direct evidence cannot be produced, proof may be made of any and all circumstances which have a rational or logical tendency to show the truth as to the disputed matter."

The question here is whether the business habits of the deceased and the fact he customarily used a typewriter in drawing his contracts had any probative value as to the authenticity of the signature on the written instrument. It appears clear from the evidence that the contract was written by the appellee, Hays, not Park. It could not be contended that Park was in the habit of signing his name with a typewriter. We are forced to conclude that the probative value of the testimony was so remote that the trial court did not abuse its discretion in denying the testimony.

The appellant contends that:

"The Court erred in refusing to allow a qualified petroleum engineer to testify relative to the normal manner of disposing of brine and salt water from oil wells in eastern Kansas, and it was error for the Court to refuse to allow the proffered evidence that no imput well was needed by Park or Hays upon their Early leases."

The appellant attempted to introduce evidence concerning the method employed by the appellee in disposing of the salt water produced from his oil wells and the normal method of disposing of salt water in the area. The purpose was to show that there was no reason for the purported agreement to have been entered into and therefore it tended to establish that the signature of Park was a forgery.

We agree with the ruling of the trial court. A controversy between experts as to the most advantageous manner of disposal of salt water had very little relation to the question as to whether Park's signature on the instrument was genuine. The parties had a right to contract for disposal by an input well if they saw fit, regardless of how salt water was presently being disposed of. The testimony had so little probative value, if any, that the trial court was justified in refusing it.

Last, the appellant complains of the interest allowed on a note which was an offset against the claim of appellee. The facts pertinent to this issue are stated in the trial court's memorandum determining credit on note and directing entry of judgment which reads:

"The relevant facts appear to be that on August 1, 1959 plaintiff purchased an oil and gas lease from Park, the major part of the consideration for which was a $2,000 note which was due October 1, 1959 from which date it was to bear interest at 6%. Prior to this transaction and on February 16, 1959 plaintiff and Park had contracted relative to an imput well. Park died in September of 1959 prior to carrying out his part of the February 16th contract. On June 14, 1961 plaintiff filed his claim against Park's Estate in which he gave said Estate credit for said note as an offset. Plaintiff's claim was certified to this Court for trial and at the trial the jury found for plaintiff in the sum of $8100 but such Verdict did not give credit for said note because the jury was instructed not to do so. Judgment has been reserved since the Verdict was returned.

"From the facts it is concluded that the Estate is entitled to interest at 6% on said note from October 1, 1959 to June 14, 1961, which amounts to $204.67, and that the claim of plaintiff in the sum of $8100 should be offset by the sum of $2204.67 leaving a net of $5895.33 for which sum judgment should be entered."

The appellant contends that the note was a liquidated demand and that interest should have been allowed thereon to the date of the final judgment. We are forced to agree with appellant's contention.

The general rule is that liquidated demands bear interest until the time the debt is paid or merged in judgment. (*Parks v. Snyder,* 126 Kan. 446, 268 Pac. 814.) The fact that the amount of a promis-

sory note is an admitted offset against an unliquidated claim does not affect the right to interest on the liquidated offset. The note grew out of a separate and independent transaction and the amount due was never in dispute. The trial court should have allowed interest in accord with the express provisions of the note until it was merged in judgment. (*Howell v. Ablah*, 188 Kan. 244, 251, 361 P. 2d 872.)

The judgment should be affirmed on all of the issues except the allowance of interest on the note admitted to be an offset. It should be reversed as to the allowance of interest on the note with instructions to calculate the interest on the note to the date it was merged in the final judgment.

It is so ordered.

APPROVED BY THE COURT.

FONTRON, J., dissenting in part and concurring in part: In my judgment, the trial court erred in refusing to admit evidence to show the business practices and habits of the decedent, Dean Park, and the normal procedure of disposing of salt water in eastern Kansas. The rule set out in 1 Jones, Evidence, (5th ed.) § 154, p. 275, and approved by us in *In re Estate of Curtis*, 193 Kan. 431, 394 P. 2d 59, is correctly stated in the majority opinion, but it is then ignored.

One of the central issues at the trial was whether the decedent had signed the alleged agreement. The evidence as to this was in sharp conflict, one expert testifying that the signature of Park was genuine, and two experts testifying it was not. There was also undisputed evidence that no copy of the alleged agreement was found among Park's papers, and that plaintiff never mentioned such an agreement to the administratrix of Park's estate until nearly two years after Park's death despite the fact that, in the meantime, he had offered to share with the administratrix the cost of drilling another input well on Park's lease.

In view of the foregoing circumstances, I believe that the decedent's business habits and methods were relevant and possessed probative value. The admissibility of a person's habit, usage or custom as evidence that he did or did not do a questioned act is said to be generally conceded. (1 Wigmore, Evidence, (3rd ed.) § 93, p. 520.)

K. S. A. 60-449 is, in effect, a statutory affirmation of this general rule of law. It reads:

"Evidence of habit or custom is relevant to an issue of behavior on a specific occasion, but is admissible on that issue only as tending to prove that the behavior on such occasion conformed to the habit or custom."

Here, the rejected evidence was offered by defendant to provide an inference that Park did not sign the agreement in question because, on the specific occasion alleged, he would have conformed to his usual and customary practice of preparing his own contracts for his signature. Under our statute, I believe the proffered testimony was admissible for that purpose. Judge Gard commenting on this statute in his work, Kansas Code of Civil Procedure, annotated, says:

". . . It is quite obvious that evidence of a well established habit has considerable probative value, and that it should not yield readily to the objection that it involves inquiry into collateral matters." (p. 440.)

The foregoing view accords with the statement set out in 2 Wigmore, Evidence, (3rd ed.) § 376, p. 306:

"That a *negative habit* may be shown, and not merely an affirmative one, seems unquestionable, *i. e.* that a person systematically omits to do a certain thing; separate instances suffice to persuade us on such matters in everyday life, and they should be received as probative in courts of justice. . . ."

Similar considerations apply to the testimony proffered to show the normal procedure for disposing of salt water in the eastern Kansas oil fields. Such evidence would have had probative value, as I see it, as tending to show there was no need for an input well, and thus no motivation for entering into an agreement for one.

I concur in that portion of the majority opinion reversing the judgment as to the allowances of interest. However, I would return the cause for a new trial generally.