(596 P 2d 156)

No. 49,696

THOMAS E. BUTLER, *Appellant & Cross-Appellee,* v. WESTGATE STATE BANK, *Appellee & Cross-Appellant.*

Opinion filed June 15, 1979.

*David L. McLane,* of Pittsburg, for the appellant and cross-appellee.

*Eileen Hiney,* of McDowell, Rice and Smith, of Kansas City, for the appellee and cross-appellant.

Before FOTH, C.J., PARKS and SWINEHART, JJ.

FOTH, C.J.: This is an action by Thomas E. Butler against the Westgate State Bank for damages for breach of an alleged contract to make a $30,000 loan. Plaintiff proposed to use the loan proceeds to purchase a franchise for the production and sale of area telephone directories in the metropolitan Kansas City area. A jury awarded plaintiff $47,600, specifying in answer to a special question that $40,000 of that amount was for lost profits.

On the bank's post-trial motion the court entered judgment for plaintiff, notwithstanding the verdict, in the amount of $7,600 for plaintiff's out of pocket expenses. According to a breakdown provided by the jury this included a $5,000 loan made by defendant bank and repaid, $100 in interest, $1,500 lost wages for one month, and $1,000 in miscellaneous expenses. Eliminated was the $40,000 in lost profits, calculated by the jury as $20,000 for two books to be earned over two years. Plaintiff appeals from the remittitur of the $40,000; defendant cross-appeals from the judgment for $7,600.

I.

A.   The primary argument on the cross-appeal is that there was

insufficient evidence to show that the bank ever made a binding agreement to loan plaintiff the $30,000. The bank raised this issue by a motion for directed verdict at the close of plaintiff's case, and again by its motion for judgment n.o.v. The trial court, at least as to the $7,600, denied both motions. On appellate review a district court's ruling on such motions will not be set aside if the ruling is supported by substantial competent evidence. *Apperson v. Security State Bank,* 215 Kan. 724, 732-33, 528 P.2d 1211 (1974); *Fisher v. Sears, Roebuck & Co.,* 207 Kan. 493, 485 P.2d 1309 (1971). The appellate court is required to resolve all facts and inferences reasonably drawn from the evidence in favor of the party against whom the motions were made. Where the evidence is such that reasonable minds could reach different conclusions thereon, an appellate court must uphold the lower court's denial of the motions. *Simpson v. Davis,* 219 Kan. 584, 589, 549 P.2d 950 (1976); *Ellis v. Sketers,* 1 Kan. App. 2d 323, Syl. ¶ 4, 564 P.2d 568, *rev. denied* 223 Kan. clxxi (1977).

Taking the evidence in the light most favorable to plaintiff, it showed the following:

In late 1971 the plaintiff went to work for a company called "Better Business Pages," which was in the business of producing, selling and distributing so-called "area-wide telephone directories." He was originally employed as a commissioned salesman in the Kansas City area to sell advertising space in the directory to local merchants. The directories themselves were distributed free of charge to area residents.

After completing the sales campaign for the directory in the Wyandotte County area, plaintiff was promoted to sales manager and underwent management training in the company's home offices in Texas. He then returned to the Kansas City area and managed the company's sales force for the directory to be produced for the area in Clay-Platte County, Missouri. Upon completion of the Clay-Platte sales campaign Butler and his sales force began selling their advertising in Johnson County. There were to be three "books" or directories in the Kansas City area, and with each sales campaign taking approximately four months, he anticipated keeping his sales crew gainfully employed the year round.

Approximately half-way through the Johnson County campaign the Better Business Pages owner became involved in liti-

gation with one of its franchise holders, a Mr. George Schuler of Plano, Texas. Schuler successfully concluded the litigation by acquiring virtually all the assets of Better Business Pages, including their various franchises. Schuler decided to discontinue the Kansas City operations and to sell the franchise for this area.

In the late summer of 1972 plaintiff and Schuler discussed the possibility of plaintiff's purchasing the Kansas City area franchise. After further discussions Schuler agreed to sell the Kansas City franchise to plaintiff for $30,000.

Butler telephoned the defendant bank in Kansas City, Kansas, where he had previously borrowed money and conducted his banking business for several years. He talked with Mr. Keith Abram, with whom he had previously dealt, and told him "how much and what it was for." Mr. Abram, a loan officer of the defendant bank, was familiar with the directory since the bank had purchased advertising in prior publications.

Abram advised the plaintiff of what information the bank would need to consider the loan, including facts and figures concerning the business, and also information from plaintiff's attorney concerning his late father's estate, from which he expected a sizeable inheritance. Plaintiff spoke to his attorney who forwarded the requested items, and Schuler obtained the information regarding the franchise operation. Later plaintiff relayed this information to Abram.

At the time of the second telephone conversation Abram indicated, after noting the information supplied by Schuler, that he would have to "present it to his people" before making a commitment, probably referring to the bank's board of directors.

The following day, in a third conversation with Abram, Butler was told "that there was no problem on the loan," that he would get $5,000 for the agreed down payment, and that "they had approved the loan for the entire amount but I would have to come up there to sign the papers" and work out other details. There was discussion regarding repayment—whether it should be a ninety day note or repaid over a longer period such as two years.

During the second telephone conversation with Abram, George Schuler was also on the phone, and himself conversed with the loan officer. He gave Abram a "brief history of our company and who I was and how I got to where I was, who my bank was, who my accountant was, who my attorney was." He also provided the

name and phone number of the attorney for the previous owner of Better Business Pages. Abram concluded by saying that he was familiar with the book, thought it would be a success and that he thought they could "work something out." However, he needed to make sure "you are real people."

A few days later, Schuler also had a second conversation with Abram. At that time Abram said he had had a conversation with Schuler's banker and lawyer and told Schuler and the plaintiff (who was also on the line) that "we will make the loan." After further discussion, it was agreed that plaintiff would be given immediate credit for $5,000 for the down payment and that the details on the balance would be worked out when plaintiff returned to Kansas City.

Following this conversation Schuler's attorney prepared a contract for the sale of the Kansas City franchise to plaintiff for $30,000 with $5,000 payable immediately and the balance by October 15, 1972. The contract was executed by plaintiff and Schuler and was dated September 29, 1972.

In his last conversation with Abram plaintiff was told to return to Kansas City "to take care of the rest of the paperwork." The $5,000 was mailed or wired to Schuler's bank in Texas.

Upon his return to Kansas City, plaintiff first visited his attorney who was incorporating his business, and the next morning went to the bank to see Abram. After waiting for some time he was told to return the next day. The following day he was similarly advised. On the third day he was told he must see Bill Martin, the bank president.

Martin told him that he didn't have any business going through Abram for a loan of that size and that the plaintiff should have dealt directly with him. Martin informed the plaintiff that the bank was "turning down the balance of the loan on the basis that they didn't know when the estate would be settled."

This evidence, which was apparently accepted by the jury, is sufficient to show a contract to lend the $30,000, partial performance to the extent of the $5,000 advanced, and a subsequent breach by the bank.

Where the evidence pertaining to the existence of a contract or its terms is conflicting or admits of more than one inference, a question is presented for the trier of facts. *Hays v. Underwood, Administrator,* 196 Kan. 265, Syl. ¶ 1, 411 P.2d 717 (1966). The

controlling question of whether a binding contract was entered into depends upon the intention of the parties and is a question of fact. *Phillips & Easton Supply Co., Inc. v. Eleanor International, Inc.,* 212 Kan. 730, Syl. ¶ 3, 512 P.2d 379 (1973).

Since there was conflicting evidence regarding the intentions of the parties to enter into a binding contract, a jury question was presented. The jury's finding on this issue is conclusive on appeal if supported by substantial competent evidence. Without repeating what has been recited above, we note that the strongest evidence supporting the jury's finding is that the bank sent the $5,000 down payment to Schuler's bank in Texas. It is a basic rule of contract law that an offer may be accepted by performing a specified act. *Crouch v. Marrs,* 199 Kan. 387, 393, 430 P.2d 204 (1967); *Gunnison v. Evans,* 136 Kan. 791, 18 P.2d 191 (1933). The jury could readily infer an intent on both parties to enter into a binding contract.

The bank argues, however, that the terms of the contract were too indefinite to be enforceable. In order for an agreement to be binding, it must be sufficiently definite as to its terms and requirements as to enable a court to determine what acts are to be performed and when performance is complete. The court must be able to fix definitely the legal liability of the parties. *Richards Aircraft Sales, Inc. v. Vaughn,* 203 Kan. 967, 971, 457 P.2d 691 (1969); *Hays v. Underwood, Administrator,* 196 Kan. at 267-68; *Nichols v. Coppock,* 124 Kan. 652, 261 Pac. 574 (1927). However, there are exceptions to this general rule, one being that the law will favor upholding a contract against a claim of uncertainty where one of the parties, as here, has entirely or partially performed his part of the contract. *Hays v. Underwood, Administrator,* 196 Kan. at 268; Restatement of Contracts § 33 (1932).

Furthermore, where it appears that the parties intended to enter into a binding contract but left particular matters to be determined in the future, the contract is not unenforceable on the ground of indefiniteness.

"If the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left.

"The fact that the parties have left some matters to be determined in the future should not prevent enforcement, if some method of determination independent of a party's mere 'wish, will, and desire' exists, either by virtue of the agreement

itself or by commercial practice or other usage or custom. This may be the case, even though the determination is left to one of the contracting parties, if he is required to make it 'in good faith' in accordance with some existing standard or with facts capable of objective proof." 1 Corbin on Contracts § 95. See also K.S.A. 84-2-305.

Here, there is conflicting evidence concerning whether the parties reached a definite agreement on the repayment schedule. Plaintiff testified that two years was fixed because the anticipated profits would permit repayment in that time and still cover plaintiff's living expenses. Ninety days was considered, with repayment to come from plaintiff's expected inheritance, but there was a question as to whether the estate would be settled in that time. The jury apparently resolved the issue in favor of the two years.

It is undisputed, however, that the parties did not discuss the interest rate to be charged. Nevertheless, the jury found that the parties intended to enter into a binding contract and this finding is supported by substantial competent evidence. Under the rule stated in Corbin, the loan agreement is not unenforceable by reason of an indefinite interest rate (or repayment terms) because those terms could have been reasonably determined through commercial practice or custom—plaintiff had borrowed money from the bank on at least one prior occasion. The bank obviously didn't find the failure to agree on the interest rate to be an insuperable obstacle because it partially performed its part of the contract by advancing the $5,000 down payment, without even having a signature on a note. From plaintiff's evidence the jury could readily infer that the parties contemplated an interest rate that would be the going rate, and the real reason the bank reneged on the additional $25,000 was a change of mind by the bank's senior officers.

B. Alternatively, the bank argues that plaintiff could have mitigated his damages by borrowing the $30,000 elsewhere. Specifically, the bank points to a $30,000 loan obtained by plaintiff from the Brotherhood State Bank some two months later. It is not contended that this was in time to save the franchise deal, but that it shows that plaintiff had an alternative source of financing available.

Plaintiff's testimony on this issue was that he went to at least two other banks and every other possible source he could think of without success. He did not go to the Brotherhood bank because

his sister's husband was president and he had determined not to go to his family for money. Although not fully developed, there was testimony indicating a serious dispute in plaintiff's family. The loan actually secured was only sought "out of desperation" when the defendant bank began pressing for repayment of the $5,000 already lent—and lost by plaintiff when the franchise purchase fell through—and other creditors joined the pursuit.

On the general duty to mitigate damages we have said:

"After the plaintiff has reason to know that a breach has occurred, . . . he is expected to take such steps to avoid harm as a prudent person would take. He cannot get damages for harm that could thus be avoided. . . . It is not reasonable to expect the plaintiff to avoid harm if at the time for action it appears that the attempt may cause other serious harm. He need not enter into other risky contracts, incur unreasonable inconvenience or expense, disorganize his business, or put himself in a humiliating position or in one involving loss of honor and respect." *Barbara Oil Co. v. Patrick Petroleum Co.*, 1 Kan. App. 2d 437, 441, 566 P.2d 389 (1977). See also cases cited.

In this case plaintiff's testimony indicates that to mitigate in accordance with the bank's theory would have, at the least, put him in a "humiliating position." The jury was instructed on his duty to mitigate and found for him. The trial court, in ruling on the bank's post-trial motions, specifically found that "His obligation to mitigate does not require him to go elsewhere for the loan that Westgate reneged on." Both the jury and the court thus found that the bank did not carry its burden of proof on the affirmative defense of mitigation of damages. See *Rockey v. Bacon*, 205 Kan. 578, Syl. ¶ 6, 470 P.2d 804 (1970). These are in the nature of negative findings. We cannot disturb them on appeal in the absence of undisputed evidence or other factors not present here. See *Highland Lumber Co., Inc. v. Knudson*, 219 Kan. 366, Syl. ¶ 5, 548 P.2d 719 (1976); *Short v. Sunflower Plastic Pipe, Inc.*, 210 Kan. 68, Syl. ¶ 4, 500 P.2d 39 (1972).

C. We conclude there was substantial competent evidence to support the findings by the jury (and the trial court) that there was a binding contract to lend plaintiff $30,000 which was breached, and that plaintiff's efforts to mitigate his damages by seeking to borrow elsewhere were all that could reasonably be expected.

II.

As to the $40,000 in lost profits, the subject of the main appeal, plaintiff's evidence came largely from George Schuler, the proposed seller of plaintiff's franchise. He testified that he had

operated several similar businesses in Texas and Louisiana for a number of years. In his opinion the area in Hunt County, Texas, was comparable to the Clay-Platte County area in Missouri which plaintiff was to buy. He based this on area population and the number of directories put out by his company. On the same basis he found the White Rock area in northeast Dallas comparable to Wyandotte County, Kansas.

His testimony was that the Hunt County operation consistently produced net profits of $20,000 to $25,000 per year, the White Rock operation $35,000 to $41,000. The latter figures, he explained, were somewhat higher than could be expected in Wyandotte County because there were other similar operations in the Dallas area which, because of the expanded listings, made each more desirable. Basically, however, the gist of Schuler's testimony was that plaintiff could reasonably expect similar results from his two operations in the Kansas City area.

In sustaining the bank's post-trial motions in part the trial court orally stated:

"THE COURT: The question of whether there was a contract for the defendant to lend the plaintiff $30,000.00 was settled by the jury verdict. The jury, by its verdict, found that there was such a contract. The Court finds there is competent evidence to support that decision and, as a matter of fact, the Court is satisfied that the contract was proven. The $47,600.00 verdict really has two components, $7,600.00 so-called out-of-pocket and the $40,000.00 loss of business profits. As to the $7,600.00 there really isn't much question; the plaintiff lost this by reason of the breach of contract. His obligation to mitigate does not require him to go elsewhere for the loan that Westgate reneged on. The $40,000.00 loss of business—the best evidence is, and I believe the little memo that the jury sent down would indicate that they were thinking in terms of $20,000.00 a year profit for two years, and there was evidence which might support that, but this would have required Mr. Butler's services for the next two years; he couldn't have operated this and done something else. We don't have evidence as to what else he did. He was certainly under an obligation to mitigate damages. Now, he could have perhaps made $40,000.00 the first two years if he had been successful, but we don't have evidence to support the fact that he was $40,000.00 poorer by reason of this deal falling through—maybe he went into something else that was a whole lot more remunerative—and as far as I am concerned, this $40,000.00 is still entirely speculative. The people down in White Rock, Texas, would take real exception to comparing Kansas City, Kansas, with White Rock, Texas, I promise you that. So I cannot let the $40,000.00 stand. I do at this time enter a judgment for the plaintiff for $7,600.00 and costs."

In its brief the bank points out that the trial court's grounds for setting aside the $40,000 for lost profits are not "absolutely clear."

We might agree, as to "absolutely," but two elements of the court's thinking do come through: (1) primarily the court found it significant that there was no evidence of plaintiff's income from other employment during the two years it would have taken him to make the $40,000 in profits; and (2) the court also suggested that Schuler's opinion evidence on which the $40,000 was based was derived from experience in at least one Texas community which might not be comparable to the Kansas City area.

The bank makes no effort to support the ruling on the first ground, and with good reason. As previously noted, mitigation of damages is an affirmative defense, and the burden of proof falls on the party asserting it. *Rockey v. Bacon,* 205 Kan. 578, Syl. ¶ 6. The absence of evidence of plaintiff's earnings means the *bank* failed to sustain its burden, and not that plaintiff failed to prove his loss.

The second reason, at least hinted at by the trial court, is one point in the bank's two-pronged attack on the lost profits verdict. The bank argues (1) it was impossible for plaintiff to establish lost profits because he never successfully operated the business, and (2) Schuler's comparables were not comparable. We reject both arguments.

A. We would agree with the bank that speculation cannot be the basis for an award of lost profits. *States v. Durkin,* 65 Kan. 101, 68 Pac. 1091 (1902); *McCracken v. Stewart,* 170 Kan. 129, 223 P.2d 963 (1950); *Sullivan v. Sproule,* 176 Kan. 274, 269 P.2d 1015 (1954). However, the age-old concept that past profitable operation is a prerequisite to proving future profits was dealt a mortal blow in *Vickers v. Wichita State University,* 213 Kan. 614, 518 P.2d 512 (1974). There, before the breach the plaintiff had broadcast basketball games under the breached contract for three seasons, showing a profit for the first and losses for the next two. The trial court directed a verdict against him because he could not show established profitability on which to base future profits. The Supreme Court reversed, holding that the trial court had imposed an unreasonably strict standard of proof.

"Unquestionably, a method of establishing a loss of profits with reasonable certainty is by showing a history of past profitability. Past profitability of a particular business is not, however, the only method of proving lost future profits. The evidence necessary in establishing lost future profits with reasonable certainty 'must depend in a large measure upon the circumstances of the particular case. . . .' (Requirements of Certainty of Proof of Lost Profits, 64 Harv. L.

Rev. 317, 319.) Absolute certainty in proving loss of future profits is not required. (22 Am. Jur. 2d, Damages, § 172.) What is required is that the court or jury be guided by some rational standard. (*Brenneman v. Auto-Teria, Inc.*, 260 Or. 513, 491 P.2d 992; *Smith Development Corp. v. Bilow Enterprises, Inc.*, [112] R.I. [203], 308 A.2d 477; *Mechanical Wholesale, Inc. v. Universal-Rundle Corp.*, 432 F.2d 228 [5th Cir. 1970].) As to evidentiary matters a court should approach each case in an individual and pragmatic manner, and require the claimant furnish the best available proof as to the amount of loss that the particular situation admits. (McCormick, Law of Damages, § 219 [1935].) It is the responsibility of a district court to see that speculative and problematical evidence does not reach the jury. (*Peterson v. Bachar*, [193 Kan. 161, 392 P.2d 853].)

"Strict application of the certainty doctrine would place a new business at a substantial disadvantage. To hold recovery is precluded as a matter of law merely because a business is newly established would encourage those contracting with such a business to breach their contracts. The law is not so deficient. (*Hoge v. Norton*, [22 Kan. °374].)

"Certainly the televising of conference basketball games and the selling of advertising in connection therewith is *not a new or untried business.* There are techniques available in the advertising and television business by which profits can be calculated with reasonable certainty to justify a contractual relationship." 213 Kan. at 620. Emphasis added.

The bank seeks to distinguish *Vickers* on the ground that the business there had been in operation for three years, while the business here has not been operated at all *by the plaintiff.* We do not believe the distinction is valid. The *Vickers* test is not whether the particular partnership or company involved is new or untried, but whether the general business which the partnership or company will carry on is new or untried. This is clear from the last paragraph quoted above, and from the court's reliance on *Brown v. Hadley*, 43 Kan. 267, 23 Pac. 492 (1890) and *States v. Durkin*, 65 Kan. 101, in both of which the particular enterprise was new but the general field of endeavor was established.

Here, the production, sale and distribution of telephone directories is not a new or untried business, as evidenced by Schuler's operation of a number of such businesses from 1970-75, by the operations of his predecessor, and by the prior operation of such a business in the Kansas City area. It does not matter that plaintiff's directory business never got underway. All that is required is that the directory business in general be sufficiently established so that people of experience in the business can estimate profits with reasonable certainty. That test was met.

B. The second ground for disallowing the lost profits— alluded to by the trial court and urged by the bank—is the alleged

difference between the Texas communities and the Kansas City area. Those differences were recognized by Schuler in his testimony summarized above, and allowances were made. The jury in its notations on the verdict form indicated they foresaw profits of $20,000 each for two books over a two year period, thus discounting substantially the $25,000 and $35,000 *annual* profits from the two Schuler operations deemed comparable by him.

As we see it the weight to be given the Schuler testimony was to be determined by the jury and not the court. An analogous situation exists in condemnation cases where the value of land must be determined. In those cases, as in this, expert testimony is employed to determine value. Recognizing that no two parcels are exactly alike, courts nevertheless permit opinion testimony based on sales of comparable property. See, *e.g., Skelly Oil Co. v. Urban Renewal Agency,* 211 Kan. 804, 805-6, 508 P.2d 954 (1973). Whether the "comparables" are sufficiently similar to the land in question as to be independently admissible is a question to be determined in the trial court's discretion. *Gault v. Board of County Commissioners,* 208 Kan. 578, Syl. ¶ 3, 493 P.2d 238 (1972). In *Gault* the Court quotes with approval text material indicating that "if properties are reasonably similar, and a qualified expert is of the opinion that the price brought by one either affects or tends to show the value of the other, it is better to leave the dissimilarities to examination and cross-examination than to exclude the testimony . . . ." 208 Kan. at 582. Under K.S.A. 60-456(*d*) and 60-457 Schuler could have expressed his opinion of profitability without going into the data on which it was based, subject to the bank's right of cross-examination. *Cf. State v. Pyle,* 216 Kan. 423, 442, 532 P.2d 1309 (1975).

Under these principles it was clearly proper for the trial court in this case to submit Schuler's testimony to the jury, leaving it to counsel to cross-examine as to comparability and to argue the weight to be given to his opinion. The question is whether the post-trial order, which had the practical effect of striking the testimony, constituted an abuse of discretion.

The court admitted Schuler's testimony over repeated objection. Although expressing some doubt, it submitted the question of future profits to the jury. When it struck the profit item from the verdict, in speaking of the jury's finding of $20,000 annual profit for two years the court conceded "there was evidence which

might support that." It ruled as it did largely on the ground (shown above to be untenable) that plaintiff had not proven what his income was after the breach, and therefore had not shown "that he was $40,000 poorer." Only in passing did the court remark that people in White Rock, Texas, would "take exception" to their community being compared to Kansas City, Kansas. This is not the same as saying the two communities are so dissimilar that any conclusions based on their similarities are worthless. If this is what the court's offhand and seemingly jocular comment was intended to convey we do not find substantial support for it in the record. If it had been intended as a serious ground for the order, it would have amounted to an abuse of discretion. And, of course, even this comment doesn't touch on Schuler's comparison of Hunt County, Texas, with the Clay-Platte County area of suburban Kansas City, Missouri.

In short, we hold that the evidence of damages presented was the best available under the circumstances and the court properly submitted it to the jury in the first instance. The error was in striking the result, based on the trial court's view of the weight to be given the evidence presented.

### III.

The bank also argues that if plaintiff *is* entitled to the $40,000 in lost profits, he is not also entitled to the $7,600. We agree, and at oral argument plaintiff's counsel conceded the correctness of this position. The losses included in the $7,600—the $5,000 loan and interest, lost wages, etc.—are expenses plaintiff would necessarily have incurred if the entire loan had gone through, plaintiff had purchased the franchise, and reaped the $40,000 profit. The purpose of compensatory damages is to make the injured party whole, not to afford a windfall. Plaintiff cannot have both.

The result is that the judgment is reversed and the case is remanded to the district court with directions to enter judgment for the plaintiff for $40,000 and costs.