### HILL'S PET NUTRITION, INC., Plaintiff–Appellee,

v.

### FRU-CON CONSTRUCTION CORPORATION and Fru–Con Engineering Inc., Defendants–Appellants.

No. 96–1476.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 1, 1996.

Decided Nov. 21, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 2, 1997.

64

Terrill D. Albright, John Joseph Tanner, Baker & Daniels, Indianapolis, IN, Sherman A. Botts, Lathrop & Gage, Kansas City, MO, for Plaintiff–Appellee.

Donald J. Graham, Paul A. Bokota, Bingham, Summers, Welsh & Spilman, Indianapolis, IN, Andrew W. Manuel, Michael E. Wilson, Greensfelder, Hemker & Gale, St. Louis, MO, for Defendants–Appellants.

Before CUMMINGS, BAUER, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Parties who have ongoing business relations can establish a contract even when they have not been able to agree on all terms, and the mirror-image rule applicable to executory agreements therefore has not been satisfied. See *Roberts & Schaefer Co. v. Merit Contracting, Inc.,* 99 F.3d 248 (7th Cir.1996); *Restatement (2d) of Contracts* § 34(2) (1981); E. Allan Farnsworth, I *Farnsworth on Contracts* § 3.8c (1990). A corollary to this principle is that the contract contains only the agreed-on terms; one side cannot use partial agreement to enforce proposals to which the other side did not assent. *Venture Associates Corp. v. Zenith Data Systems Corp.,* 96 F.3d 275 (7th Cir.1996). That corollary is dispositive today.

Hill's Pet Nutrition hired Fru–Con Construction and Fru–Con Engineering to renovate and enlarge its pet food plants. Fru–Con agreed to do the work on a cost-plus basis, with incentive payments for keeping total costs down. While corporate executives and their lawyers were negotiating the precise terms of a master agreement to govern the $200 million deal, Fru–Con commenced one large project and a few smaller ones under oral understandings. Work began in March 1994. Negotiations over basic terms went smoothly, but the parties ultimately could not agree on some fundamental issues: how "cost" would be defined (specifically, what percentage of salaried employees' wages would be deemed to represent the cost of fringe benefits such as pensions and health care); whether certain costs would be estimated from a schedule or calculated exactly; and whether Hill's would guarantee Fru–Con a minimum profit even if, because of cost overruns, the incentive clauses could expose Fru–Con to loss. Hill's discharged Fru–Con in November 1995, and each believes that the other owes it money. Hill's commenced litigation under the diversity jurisdiction, and Fru–Con demanded arbitration—which Hill's resisted on the ground that the parties' inability to complete their negotiations meant that it is not obliged to arbitrate. After receiving testimony, the district judge concluded that each side had signed a different version of the proposed master agreement and held that they had therefore not agreed on anything at all, precluding the possibility of arbitration. Fru–Con took an immediate appeal under 9 U.S.C. § 16(a)(1)(A).

■ One of Fru–Con's arguments on appeal—that Hill's and Fru–Con really finished the master agreement, and that what the district judge saw as deal-breakers were just typographical errors that it was entitled to correct without need of further approval from Hill's—misconceives the role of an appellate court. Unless the district court's findings of fact are clearly erroneous, we must accept them. *Anderson v. Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). These findings are well supported, so we must take it that the parties never came to closure on all terms of the master agreement. The district judge

thought that lack of agreement on a single term means that there is no contract on any term. That may be so when the negotiations are wholly anticipatory, but the parties have not given us any reason to believe that Kansas and Indiana (the two states whose law might govern; we need not decide which does) depart from the rule that, when the parties commence performance with some issues still to be resolved, their agreement includes all of the terms that have been mutually approved. See *International Creative Management, Inc. v. D & R Entertainment Co.,* 670 N.E.2d 1305 (Ind.App.1996); *Butler v. Westgate State Bank,* 3 Kan.App.2d 403, 596 P.2d 156 (1979). Both sides signed drafts of the master agreement containing an arbitration clause. Language of this clause was identical in each side's final draft and the version executed by both parties (albeit with Fru–Con's "corrections" in three other clauses). Performance continued for a year and a half and changed to track revisions to clauses of the master agreement on which the parties reached concord; we therefore conclude that Hill's has agreed to arbitration.

■ But *what* has it agreed to arbitrate? The clause reads:

In the event of a dispute between the parties, both parties agree to attempt to resolve the issue in a good faith and amicable manner. In the event the parties are unable to resolve their differences, both parties agree that they will submit any dispute, claim or action relating to this Agreement to the American Arbitration Association for arbitration in accordance with the Construction Industry Arbitration Rules then in effect. The decision of such arbitration shall be valid and binding on both parties. Both parties agree that the location for such arbitration shall be Topeka, Kansas. However, the panel for such arbitration shall be selected from a list provided by the American Arbitration Association office in Kansas City, Missouri.

The scope of this agreement is something the court must resolve. *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). And "[w]hen deciding whether the parties

have agreed to arbitrate a certain matter … courts generally … apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan;* —— U.S. ——, ——, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995). Hill's and Fru–Con agreed to arbitrate "any dispute, claim or action relating to this Agreement". To see whether the district court should have ordered the parties to arbitrate, we must therefore decide whether their dispute related to "this Agreement"—that is, to the portions of the draft master agreement on which the parties agreed. Given the district court's findings, the answer must be no.

The dispute over which Hill's filed this suit arose out of cost overruns at the pet food plant in Richmond, Indiana, work on which was governed largely by oral understandings. The master agreement, had it been fully adopted, would have resolved issues common to many projects, but it did not contain details for any plant's construction or specify the benchmarks by which "success" was to be established. These were to be negotiated project by project. Some of the details in the master agreement, such as the definition of "costs" on which the cost-plus reimbursement formula was to operate, would have affected the Richmond dispute—but these were the very items over which negotiations collapsed. At oral argument, counsel for Fru–Con declined an opportunity to argue that the parties' current disputes could be resolved by application of the terms in the master agreement on which consensus was achieved. Instead he invited us to take a generous view of the arbitration clause, pulling within its scope not only the unresolved issues but also the plant-specific oral understandings. That is not the approach to arbitration clauses endorsed by *AT & T Technologies* and *First Options.* Thus the arbitration clause, although part of the parties' agreement, does not come into play. Fru–Con is really seeking a form of interest arbitration, under which an arbitrator would decide which party's definition of "costs" should be accepted, what multiplier should be used, and so on. These were issues left open at the bargaining table, issues the parties did not agree to pass to an arbitrator for resolution.

In sum, although we do not agree with the district court's rationale, we agree with its conclusion and affirm the decision that the dispute is not arbitrable.