No. 21,663.

THE ELMO STATE BANK, *Appellee*, V. C. M. HILDEBRAND, *Appellant*, et al.

### SYLLABUS BY THE COURT.

1. PROMISSORY NOTE—*Failure of Consideration—Evidence*. In an action on a promissory note given in payment of insurance policies, where the defense is failure of consideration because the insurance company was insolvent when the policies were issued, *held*, on the facts stated in the opinion, that the admission of certain testimony was not prejudicial error.

2. SAME—*Holder in Due Course—Set-off as between Maker and Payee*. The purchaser of a promissory note is not prevented from being a holder in due course by the knowledge of the fact that, as between the maker and the payee, there may, before the note matures, arise a set-off or counterclaim in favor of the maker.

3. SAME — *Violation of Statute — No Defense to Promissory Note*. The fact that a bank has violated the provisions of the statute prohibiting it from lending to one person or corporation more than fifteen per cent of its capital stock and surplus is not a defense available to one who is sued by the bank upon a promissory note.

4. SAME—*Finding of Good Faith of Holder—Sustained by Evidence*. A bank purchased farmers' notes before maturity, which it knew were given in payment of premiums on policies of insurance, and that in case of loss under the policies the makers would have a set-off or counterclaim against the notes. The insurance company was insolvent when the notes were executed. *Held*, on the facts stated in the opinion, there was sufficient evidence to support a finding that the bank purchased without notice of any infirmity in the notes.

Appeal from Shawnee district court, division No. 1; ALSTON W. DANA, judge. Opinion filed November 9, 1918. Affirmed.

*S. M. Hutzel*, of Wakeeney, *Lee Monroe, James A. McClure*, and *C. M. Monroe*, all of Topeka, for the appellants.

*Edwin Anderson*, of Council Grove, and *Frans E. Lindquist*, of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

PORTER, J.: The bank recovered judgment against C. M. Hildebrand on a promissory note, and he appeals.

Hildebrand gave his note for $367.50 in payment of premiums for policies of insurance issued by the Topeka Mutual

Live Stock Insurance Company upon live stock owned by him. He claims that there was no consideration for the note, and that the bank was not a purchaser in good faith. On September 9, 1915, at the time the policies were issued, the Topeka Mutual Live Stock Insurance Company was insolvent. The losses under Hildebrand's policies amounted to $205, for which he never received anything. The state insurance department made an investigation of the company in February, 1915, and each month thereafter; and the reports on file in the office of the superintendent show that at no time after February, 1915, was the company solvent, and that its liabilities were $64,000, its assets practically nothing. Notwithstanding the insolvent condition of the company, it was permitted to do business until December, 1915, when an action was brought by the state and the company placed in the hands of a receiver.

J. H. White, who organized the company, was its president, and also president of the White Insurance Agency, which appears to have been a trade name under which the insurance company transferred its premium notes. The day following the issuance of the policies the note in question was indorsed by the insurance company to the White agency, and transferred the next day by that agency to the bank. At the same time seventy other premium notes, given by various farmers throughout the western part of the state, were transferred to the bank; thirty-five of these aggregated $1,962.56, and thirty-six aggregated $2,001.97. The vice-president of the insurance company negotiated the delivery of the notes to the bank, and at the same time gave the bank two notes signed by the White Insurance Agency, one for $1,962.56, and the other for $2,001.97, receiving from the bank certificates of deposit for like amounts. The bank claimed to hold the two notes of the insurance agency, indorsed by the insurance company, as collateral to the seventy-one farmers' or premium notes. The latter, as well as the two large notes, bore 10 per cent interest; the certificates of deposit which the bank gave in exchange for the notes bore 3 per cent interest. The bank had been in the business of purchasing the insurance company's premium notes in the same manner, and had already issued certificates of deposit to the amount of over $4,000, in exchange for notes, which, together with those issued at the time the Hildebrand

note was purchased, amounted to over $8,000; and this was 44 per cent of the bank's capital stock and surplus. The cashier testified that she knew the bank was permitted to loan upon the security of any one person or corporation no more than fifteen percent of the bank's capital stock and surplus, and knew the Hildebrand note represented the payment of premiums on live stock, and understood that if a loss occurred the maker would have a claim against the insurance company as a set-off against the note, if held by the insurance company, and knew also that there would probably be losses under the policies.

In answer to special questions, the jury found that the bank acted in good faith and without knowledge of any infirmity in the paper.

The contentions of the appellant are, *first,* that there was error in the admission of testimony; *second,* that the court should have directed a verdict; *third,* that the court erred in refusing to give certain instructions.

The bank was permitted to introduce a letter written by Clay Hamilton, receiver of the insurance company, to Hildebrand, dated March 22, 1916. The letter was an apology for a former one asking Hildebrand to pay a note which Hamilton found among the papers of the insurance company, and which, it seems, was given in renewal of the first premium note. The letter stated that the receiver, not knowing the earlier history of the transactions, assumed the original note had been surrendered to Hildebrand, and that there was due the company the amount stated in the first letter; but informed him that he would not be called upon to make any payment on that note. The portion of the letter objected to was the statement that the receiver, after making an investigation, had found that Hildebrand's note was sold to the White Insurance Agency and later by that agency sold to the bank. The grounds of objection urged are, that it was a statement of matters concerning which the receiver could have had no personal knowledge, which occurred before he became receiver; and that his testimony was hearsay and necessarily derived from the books of the company, which would be the best evidence. These were all good grounds for the objection to the admission of the letter as a whole. We are unable to discover for what purpose it was

offered or admitted; and on the other hand, we are unable to discover that the defendant was prejudiced by the admission, notwithstanding a number of the jurymen on their *voir dire* examination testified they were personally acquainted with the receiver, and notwithstanding the fact that his letter was referred to in the argument of counsel for the bank as evidence that the cashier acted in good faith. There is no dispute as to the facts concerning the manner in which the bank became the holder of the note, so far as the fact of indorsement and transfer is concerned. *Prima facie*, the indorsement and transfer of the note gave the bank a good title. Nothing contained in the letter written by the receiver purported to throw any light whatever upon the good faith of the transaction between the bank and the insurance company, which was the only question at issue.

It is urged that the verdict of the jury, as well as the finding of fact that the bank acted in good faith, is contrary to the evidence, and especially the testimony of the cashier, to which we have referred. The argument is, that when a person knows there may be a set-off or counterclaim against the note by the time it matures, he cannot acquire the note free from an infirmity. The argument is not sound. Every purchaser of a promissory note knows that, as between the maker and the payee, there may, before the note matures, arise a set-off or counterclaim in favor of the maker, but this will not prevent the purchaser from being a holder in due course; nor is the fact, of itself, evidence of bad faith in purchasing. The cashier did not testify that she knew the company was insolvent, or that the note was given without consideration. No authorities are cited by the appellant in support of his contention, and we think none are necessary to show its fallacy.

The provision of the statute making it unlawful for a bank to loan more than fifteen per cent of its capital stock and surplus upon the security of any one person or corporation (Gen. Stat. 1915, § 530) was not enacted for the benefit of a person in the situation of the appellant. It was to protect the rights of depositors and creditors of the bank that the law was enacted as a measure of sound public policy. The insurance company, if sued upon notes executed to the bank, could not raise the defense that the bank had extended it a loan in excess of the au-

thorized amount; and the special finding of the jury is, that the bank purchased appellant's note in good faith, for value and without notice of any fact that would put it on inquiry that the insurance company was insolvent. Besides, the general verdict is a finding that no loan was made to the insurance company, its notes having been taken merely as collateral security for the payment of appellant's note and others purchased at the same time.

The appellant requested the following instruction, which was refused:

"You are further instructed that if you find that at the time of the transaction between the plaintiff bank and the insurance company, the insurance company was insolvent, and the note sued on was without consideration, and the circumstances surrounding the transaction were such as to justify the conclusion that the failure on the part of the bank to make inquiry as to the consideration for the notes then taken by it, including the note executed by the defendant Hildebrand, arose from a suspicion that such inquiry would disclose a want of consideration for such notes, and if inquiry would have disclosed such want of consideration, then the plaintiff bank would be charged with the knowledge of such want of consideration as such inquiry would have revealed."

On this matter the court instructed that—

"To constitute 'notice' of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his actions in taking the instrument amounted to bad faith. What is 'bad faith' in a case of this kind is a question of fact for the jury, and in this connection the court instructs you that neither a suspicion of defect of title, knowledge of circumstances which would excite such suspicion in the mind of a prudent man or put him on inquiry, nor even gross negligence on the part of the taker will affect his rights, unless the circumstances or suspicions are so cogent and obvious that to remain passive would amount to bad faith."

The doctrine upon which the appellant relies is stated in 8 C. J. 505, taken from the opinion in *Goodman v. Simonds*, 20 How. (U. S.) 343, 366, and is as follows:

"While he is not obliged to make inquiries, he must not willfully shut his eyes to the means of knowledge which he knows are at hand."

In the same section of Corpus Juris, however, it is stated that—

"Certain facts are not of themselves sufficient to show bad faith in not making inquiry, yet it often happens that evidence thereof is admissible, and, together with evidence of other suspicious circumstances, sufficient

to require the submission of the question of bad faith to the jury." (p. 506.)

The court submitted the question of bad faith to the jury in an instruction which correctly stated the law as applied to the evidence. (*Bank v. Reid*, 86 Kan. 245, 120 Pac. 339.) The appellant has not called our attention to any evidence which would have justified giving an instruction directing attention to the failure of the cashier to make inquiries as to any particular fact. The cashier admits knowledge of certain facts, which of themselves would not, as a matter of law, make the bank a purchaser in bad faith, but which were proper circumstances to be considered by the jury, with all the facts and circumstances, in determining that question. We do not understand that the evidence shows there was any fact or circumstance to cause the cashier to suspect that the insurance company was insolvent. Such is not the contention, and it is not suggested what inquiries she should have made which would have disclosed a want of consideration. If the company had not been insolvent, the issuing of the policies furnished a sufficient consideration for the note. On these facts it must be held there was sufficient evidence to support the finding of the jury that the bank acted in good faith, and the defendant, therefore, was not entitled to a directed verdict.

It is unfortunate for the appellant, and doubtless for many others, that a company organized and exploited as this seems to have been, for the mere purpose of plundering the public, was permitted to continue so long in business, but having put in circulation his negotiable promissory note, the appellant is compelled to pay, notwithstanding he received no consideration.

The judgment is affirmed.

DAWSON, J. (dissenting): This was not a case where the infirmities of the note could only be ascertained by the plaintiff by an inquiry which it was not bound to make, nor governed by the legal principles pertaining thereto. The bank's own officer, acting for the bank in the acquisition of the note, candidly admitted that she knew the conditions and terms of the contract for which the note was given; and I think the maker was entitled to set up the same defenses as would have been available against the original payee.