731 F.2d 1464
 NATIONAL FARMERS ORGANIZATION, INC., Plaintiff,
Kenneth Burkhart, Judy Catherine Burkhart, and David G.
Arst, Trustee in Bankruptcy,
Plaintiffs-Appellees/Cross-Appellants,
v.
The KINSLEY BANK, Defendant-Appellant/Cross-Appellee.
 Nos. 81-2008, 81-2075.
 United States Court of Appeals,
Tenth Circuit.
 March 29, 1984.
 
 Emmet A. Blaes of Jochems, Sargent & Blaes, Wichita, Kan., and Stan Wisdom of Stinson, Wisdom, Lasswell & Wilson, Wichita, Kan., for defendant-appellant/cross-appellee.
 James M. Concannon, III, Topeka, Kan. (Michael J. Friesen, Garden City, Kan., with him on the brief), for plaintiffs-appellees/cross-appellants.
 Charles N. Henson and Anne L. Baker of Eidson, Lewis, Porter & Haynes, Topeka, Kan., filed an amicus curiae brief for The Kansas Bankers Ass'n.
 Before BARRETT, DOYLE and LOGAN, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 The Kinsley Bank has appealed a jury verdict in favor of plaintiffs Kenneth Burkhart (Burkhart), his wife Judy Burkhart, and David Arst, Kenneth Burkhart's Trustee in Bankruptcy. The jury found the bank reneged on an agreement to loan Burkhart a large sum of money to purchase feeder lambs, and rendered a judgment against the bank for $196,736.83. On appeal the bank asserts three defenses to liability: that the loan was illegal because it was beyond the bank's authorized lending limits, that the bank president lacked authority to make the loan, and that the loan commitment was too indefinite. It also makes several objections to the damages award. Plaintiffs have cross-appealed, urging that the trial court erred in refusing to give instructions on fraud and punitive damages. Jurisdiction is based on diversity of citizenship[1], and Kansas law applies.
 
 
 2
 This suit arose out of events that occurred in 1976. At that time Kenneth Burkhart was in the business of feeding and trading sheep. He had done business with the Kinsley Bank for several years, and the bank had made him a number of loans ranging in amount from $1,000 to $20,000. In April 1976 Burkhart talked to the president of the Kinsley Bank, Clair Allison, about borrowing money to buy 15,000 to 20,000 lambs from National Farmers Organization, Inc. (NFO). Burkhart explained that NFO would deliver the lambs in the fall and that the purchase price would be $50.50 per hundredweight. Burkhart told Allison he thought he could make a profit of $1 to $3 a head on the lambs. At first Allison refused to make any loan for the deal. But Burkhart persisted, and eventually Allison agreed to lend him money. Before Burkhart and NFO signed a contract, a representative of NFO called Allison to verify that the bank would finance Burkhart's purchase. Once NFO was satisfied that Burkhart had adequate financing, NFO and Burkhart signed a contract. Burkhart then gave NFO a check for $17,190 drawn on the Kinsley bank as a downpayment of $1 a head on 17,190 lambs. Several days later Burkhart signed a promissory note payable to the Kinsley Bank for $17,190, and the bank took a security interest in all of Burkhart's interest in the lambs. It was the customary course of business between Burkhart and the bank for the bank to honor Burkhart's checks even though Burkhart had not yet signed a note. In August 1976 Burkhart began to take delivery of the lambs. To pay for the first truckloads Burkhart drew a check for $75,861 on his account at the Kinsley Bank. The bank dishonored Burkhart's check, and Allison told Burkhart that the bank would not lend Burkhart the money he needed to pay NFO. As a result, NFO stopped delivery of the lambs and eventually sold them to another buyer for $43 per hundredweight.
 
 
 3
 No one disputes that the bank agreed to lend Burkhart the money for the downpayment. The bank argued at trial, however, that all it had agreed to loan Burkhart was the money for the downpayment. Burkhart and NFO, on the other hand, argued that the bank had agreed to provide whatever amount Burkhart needed to fulfill his obligation to NFO. We are bound by the jury's finding that the bank agreed to lend Burkhart the money he needed to pay for the lambs unless the court erred in submitting the issue to the jury.
 
 
 4
 * Liability
 
 
 5
 * The bank's first defense is that the contract, if made, was unenforceable because the bank could not legally lend Burkhart the amount he needed to buy the lambs. The bank argues that the district court should have granted its motion for summary judgment based on the illegality of the contract and should not have instructed the jury, as it did, that a bank "may agree to loan funds in excess of its legal loan limit, and if it does, the borrower may hold the bank liable for breach of contract to make a loan even though the bank would exceed its limit in making such a loan."[2]
 
 
 6
 Kansas law limits the amount a bank can lend any one borrower to 15 percent of the bank's unimpaired capital and surplus. Kan.Stat.Ann. Sec. 9-1104. At the time Burkhart contracted with NFO, the Kinsley Bank's loan limit was approximately $150,000. To finance the contract, the bank would have had to lend Burkhart nearly $1,000,000, far more than it could lend him legally. No Kansas case appears to have considered whether a borrower can enforce against a bank an agreement to make a loan in excess of its lending limits. Several older cases outside of Kansas have held such contracts unenforceable. Wald v. Wheelon, 27 N.D. 624, 147 N.W. 402 (1914); E. Swindell & Co. v. Bainbridge State Bank, 3 Ga.App. 364, 60 S.E. 13 (1908). A 1956 Ninth Circuit case denied enforcement of a contract between a bank and its cashier, who the court said should know the bank's capital and surplus, to make a loan in excess of the bank's lending limits. Jaynes v. First National Bank, 236 F.2d 258 (9th Cir.1956). International Dairy Queen, Inc. v. Bank of Wadley, 407 F.Supp. 1270 (M.D.Ala.1976), denied enforcement of such a loan agreement against a bank, emphasizing that the contract was wholly executory. Other cases have enforced contracts to make a loan in excess of a bank's lending limits. First American National Bank v. Alcorn, Inc., 361 So.2d 481 (Miss.1978); Labor Discount Center, Inc. v. State Bank & Trust Co., 526 S.W.2d 407 (Mo.App.1975); Bank of College View v. Nelson, 106 Neb. 129, 183 N.W. 100 (Neb.1921); Goldstein v. Union National Bank, 109 Tex. 555, 213 S.W. 584, 588 (1919) (dictum).
 
 
 7
 Although it is a close question, we believe the Kansas Supreme Court would today enforce against a bank an agreement to make a loan above legal lending limits. Most cases denying enforcement or implying that the court would deny enforcement arose before the FDIC insured bank accounts and before the widespread use of correspondent banks to participate in loans in excess of a bank's lending limits. An important consideration is whether lending limits were intended primarily as a tool to permit state officials to enforce good banking practices or to express a public policy declaring these transactions void. We are impressed by the analysis set out in Bank of College View v. Nelson, 183 N.W. at 101:
 
 
 8
 "Was the contract void in the sense that [the bank] could violate it without becoming liable for resulting damages? In limiting the amount of an individual loan to 20 per cent. of the capital and surplus and in directing punishment for exceeding that limit, the statute established a rule for the government of the bank. Rev.St.1913, Sec. 312. The penalty for violating the act applies to 'any officer, director, or employee' of the bank. An excessive loan does not subject the borrower to a penalty. He does not stand before the statute in the same light as the offending banker. The penalty is a matter between the state and the lender. The general rule is that an excessive borrower cannot prevent the collection of his debt by pleading and proving a violation of the statute. In demanding performance of the bank's contract for an excessive loan, the borrower is not in a worse situation than the banker who is subject to a penalty for violating the law governing the bank in the transaction of its business. The borrower has nothing to do with the business management to which the statutory limitation applies. The maximum amount lendable to an individual varies with the capital and surplus. The facts are not equally available to both contracting parties at all times. The statute does not declare that excessive loans are void. They are generally enforced. In the present case both parties had performed the contract to such an extent that a heavy loss fell on the borrowers through failure of the lender to perform fully all of its obligations. Where the law permits a bank to enforce a contract for an excessive loan, it should not be permitted to escape liability for the damages resulting from its failure to fully perform such a contract."
 
 
 9
 Further, we note that Kan.Stat.Ann. Sec. 17-6104 would deny the bank the defense of ultra vires, a doctrine some of the cases have relied upon to deny recovery.
 
 
 10
 The bank cites Board of Commissioners v. Miller, 132 Kan. 52, 294 P. 863 (1931), for the proposition that Kansas courts will not maintain an action to enforce a contract prohibited by statute. That proposition, however, is an overly broad generalization because in certain situations Kansas courts have enforced such contracts. In fact, in Elmo State Bank v. Hildebrand, 103 Kan. 705, 708-09, 177 P. 6, 8 (1918), the Kansas Supreme Court stated in dictum that a borrower could not raise the illegality of the contract for a loan in excess of the statutory limit as a defense in a suit on the contract. Thus, the bank, at whom the prohibition is directed, can enforce a contract for a loan in excess of the statutory limit. In Wycoff v. Quick Way Homes, Inc., 201 Kan. 442, 441 P.2d 886 (1968), the court noted that illegal contracts are generally unenforceable but, because of the equities involved, the court allowed damages for breach of a contract that required one party to act illegally. The plaintiffs in Wycoff had sought damages against a home building corporation for breach of a contract to sell water. The trial court granted summary judgment in favor of the defendants on the ground that the contract required the defendant to act as a public utility, which the defendant could not do legally since it did not have a certificate of public convenience. The Kansas Supreme Court reversed, saying:
 
 
 11
 "A contract for the sale of water does not violate any requirement of public policy and is not illegal per se. As determined by the district court, the prohibitions of the law were upon the defendant as a public utility, and not upon the plaintiffs. There was nothing illegal about the plaintiffs' contract to purchase water and they cannot be said to be in pari delicto. We are of the opinion they are entitled to recover the damages sustained by the wrongdoing of the defendant."
 
 
 12
 201 Kan. at 447, 441 P.2d at 891.
 
 
 13
 Similarly, a loan of $1,000,000 is not illegal per se. A large bank could make a loan of that size, and a small one like the Kinsley Bank could transact a loan in that amount by working with a correspondent bank. The prohibition on excessive loans is on banks, not on borrowers.[3] Hildebrand and Wycoff, then, suggest that Kansas would enforce the contract between Burkhart and the bank.
 
 
 14
 Both parties have cited and discussed First American National Bank v. Alcorn, Inc. and Labor Discount Center, Inc. v. State Bank & Trust Co., which held that a borrower could enforce a promise by a bank to make a loan in excess of its lending limit. Those courts viewed the borrower's knowledge of the bank's loan limit as a crucial factor. The Kinsley Bank relies on those cases to argue that Burkhart's knowledge that the bank had a loan limit should bar him from enforcing the contract. Burkhart did know that the bank had a loan limit. But he also knew, through Allison, that the bank could legally circumvent its loan limit by working through a correspondent bank. Since Burkhart knew that the bank could legally circumvent its loan limit, his knowledge of the bank's lending limit made him no more culpable than a borrower who knew nothing at all about the loan limit. He did not know that the bank had agreed to an illegal loan. Thus he was not in pari delicto and should not be precluded from suing to enforce the contract, particularly since the bank, the violator, would not be precluded from enforcing the contract.
 
 
 15
 Finally, even if the Kansas court would deny recovery against the bank on a wholly executory contract to make a loan in excess of its lending limits, this was not such a case. The jury could find, as it did, that Allison had represented to Burkhart and NFO representatives that it would finance the entire transaction. The bank then advanced Burkhart the funds to make the down payment on 17,190 lambs. Thus, the loan contract was partially performed and both Burkhart and NFO changed their positions in reliance thereon. The district court did not err in denying the bank's motion for summary judgment or in instructing the jury that the bank could be held liable on the contract.
 
 B
 
 16
 The bank argues that Allison had no authority to bind the bank to a loan prohibited by statute. The district court ruled, as a matter of law, that Allison had authority to bind the bank. The defense of ultra vires is not available to the bank in a suit of this kind. Kan.Stat.Ann. Sec. 17-6104. Therefore, the only argument available to the bank is that Allison, as agent, had no authority to bind the bank, his principal, to the loan.
 
 
 17
 First, we note Allison is president and apparently is the majority shareholder of the bank. Further, the Kinsley Bank had no loan committee and no written procedure for making loans. Officers had discretion to decide whether they should discuss particular loans with the board of directors. A director testified that he could not recall any discussion of "overline loans" (excess loans made through correspondent banks) even though the Kinsley Bank had negotiated a number of such loans. Under these circumstances Allison had, at the least, apparent agency to make loans at his discretion.
 
 
 18
 "An ostensible or apparent agency may exist if a principal has intentionally or by want of ordinary care induced and permitted third persons to believe a person is his or her agent even though no authority, either express or implied, has been actually conferred upon the agent."
 
 
 19
 Shawnee State Bank v. North Olathe Industrial Park, 228 Kan. 231, 237, 613 P.2d 1342, 1347 (1980). The district court did not err in instructing the jury that the bank was liable for Allison's acts.
 
 C
 
 20
 The Kinsley Bank argues that there was no enforceable agreement with Burkhart because the parties had not agreed on the exact amount of the loan, the date of the loan, the rate of interest, or the terms of repayment. Under Kansas law
 
 
 21
 "[i]n order for an agreement to be binding, it must be sufficiently definite as to its terms and requirements as to enable a court to determine what acts are to be performed and when performance is complete. The court must be able to fix definitely the legal liability of the parties."
 
 
 22
 Butler v. Westgate State Bank, 3 Kan.App.2d 403, 408, 596 P.2d 156, 161-62, rev'd on other grounds, 226 Kan. 581, 602 P.2d 1276 (1979). Open terms, however, do not necessarily render a contract unenforceable.
 
 
 23
 " 'The fact that the parties have left some matters to be determined in the future should not prevent enforcement, if some method of determination independent of a party's mere "wish, will, and desire" exists, either by virtue of the agreement itself or by commercial practice or other usage or custom. This may be the case, even though the determination is left to one of the contracting parties, if he is required to make it "in good faith" in accordance with some existing standard or with facts capable of objective proof.' "
 
 
 24
 3 Kan.App.2d at 408-09, 596 P.2d at 162, quoting 1 A. Corbin, Corbin on Contracts Sec. 95 (1963).
 
 
 25
 The district court left the question of definiteness to the jury and gave the following instruction, which correctly summarizes applicable Kansas law:
 
 
 26
 "In order for an agreement to be legally enforceable, its terms must be sufficiently definite to allow the determination of what performance is due, and when.
 
 
 27
 If the parties mutually intend to make a contract, their agreements may be enforced even if they have left some matters to be determined in the future, provided that such matters may be determined either by virtue of their contract, by custom between the parties, or by standard commercial practice."
 
 
 28
 The district court did not err in leaving the question of definiteness to the jury. The jury could have found from the evidence that the terms left open could be adequately determined by standard commercial practice and by the customary practice between the bank and Burkhart. The evidence showed that Allison knew that Burkhart would be paying $50.50 per hundredweight for 15,000 to 20,000 lambs with an average weight of 80 pounds. Thus, the approximate amount of the loan was set, and the exact amount depended on facts capable of objective proof, not on Burkhart's mere wish. Similarly, the approximate time of the loan was set. NFO was to deliver the lambs in September and October 1976. The exact dates depended on delivery, a fact capable of objective proof.
 
 
 29
 The rate of interest and the terms of repayment could be determined by reference to commercial practice and the customary course of business between the bank and Burkhart. The market rate of interest and the purpose of the loan would be reasonable guidelines for setting the rate of interest and terms of repayment. Also, it was customary for the bank to advance money to Burkhart before the terms of the loan had been established. In Butler the court noted: "The bank obviously didn't find the failure to agree on the interest rate to be an insuperable obstacle because it partially performed its part of the contract by advancing the $5,000 down payment, without even having a signature on a note." 3 Kan.App.2d at 409, 596 P.2d at 162. That statement is applicable to this case. The Kinsley Bank honored Burkhart's check for $17,190 before the parties had agreed on interest rate or terms of repayment. The court did not err in giving the question of definiteness to the jury.
 
 II
 Damages
 
 30
 * The bank argues that the trial court should not have allowed the jury to award damages to Burkhart for lost profits. Burkhart attempted to prove his lost profits by testifying about his elaborate plan for disposing of the 18,131[4] lambs he would have owned had the bank not breached its contract to lend him money to purchase the lambs. At $50.50 per hundredweight, he said, the total purchase price for the lambs would have been $865,962.31. Burkhart testified that he would have immediately resold the heavier 9,065 lambs, which he said would have an average weight of 110 pounds, for $46 per hundredweight--that is, at a loss of $4.50 per hundredweight. He testified that the reason for selling the heavier lambs at a loss was that those lambs would not gain well in a feedlot. He figured that he would have received $458,689 for the heavier lambs. His next step would have been to pay the bank $198,523.50 and to use the remaining $260,165.50 of the proceeds to buy 9,065 70-pound Texas lambs at $41 per hundredweight. He then calculated the expense of keeping the Texas lambs on pasture land for 60 days and at a feedlot for another 60 days. He estimated that 227 lambs would have died during those 120 days and that he would have been able to sell the remaining 8,838 lambs, which he said would have had an average weight of 120 pounds, for $51.50 per hundredweight. He calculated that he would have been able to sell the wool for $14,732.25. He subtracted various expenses, and concluded that he would have made a profit of $134,087.53.
 
 
 31
 Burkhart testified that he would have sent the remaining 9,065 Colorado lambs to the feedlot upon delivery and that after several months he could have sold the lambs and made a profit of $17,595.74. Burkhart's conclusion that his total lost profits were $151,683.29 (correctly added $151,683.27)[5] was corroborated by Dr. Clifford Spaeth, the Sheep Extension Specialist for the State of Kansas, who testified that the figures Burkhart used in his calculations were reasonable.
 
 
 32
 Kansas law permits recovery of lost profits if they are proved with reasonable certainty and if they may reasonably be considered to be within the contemplation of the parties. Vickers v. Wichita State University, 213 Kan. 614, 518 P.2d 512 (1974). The requirement that recoverable lost profits be within the contemplation of both parties is a restatement of the long-standing rule of Hadley v. Baxendale, 9 Exch. 341, 156 Eng.Rep. 145 (1854). Kansas State Bank v. Overseas Motosport, Inc., 222 Kan. 26, 27, 563 P.2d 414, 415 (1977).
 
 
 33
 The purchase and resale of the Colorado lambs was the transaction the parties contemplated at the time of the contract. Burkhart testified that he thought, at the time he signed the contract, that he could resell the Colorado lambs for a profit before he had to take delivery. The most that could be inferred from the parties' conversations is that if Burkhart had to take delivery he would feed out the lambs and then sell them. Hindsight showed that he could not have made a profit by reselling the Colorado lambs. Rather, according to his own figures, without the Texas lamb purchase he would have lost $382.45.[6] Thus, by Burkhart's own admission, there were no lost profits on the Colorado lambs.
 
 
 34
 Texas lambs were the source of the lost profits Burkhart sought. But there is no evidence that Burkhart or Allison contemplated at the time of the contract that Burkhart would sell part of the Colorado lambs at a loss and then be permitted to use more than half of the proceeds to purchase Texas lambs instead of reducing his debt to the bank. We cannot assume that such a chain of events was in the contemplation of the parties. See Whiteley v. O'Dell, 219 Kan. 314, 318, 548 P.2d 798, 802 (1976) (alleged damages could not have been within contemplation of parties). It is reasonable to assume that if Burkhart and Allison had contemplated that Texas lambs were a better investment than Colorado lambs, Burkhart would have originally invested in Texas lambs rather than Colorado lambs. The district court erred in allowing the jury to award damages for lost profits.[7]
 
 B
 
 35
 The bank also argues that the district court erred in allowing the jury to award damages for loss of brokerage commissions, missed business opportunities, and damage to credit standing. Burkhart testified that he had lost several opportunities to provide his land and services to people who were planning to raise sheep. For example, C.M. Sage, the former owner of a feed yard in Garden City, Kansas, testified that he had considered hiring Burkhart to manage a lamb operation. He said he would have paid Burkhart a salary and commissions. There was no evidence that Burkhart intended to invest money in any of these enterprises. We cannot reasonably assume that Burkhart and Allison contemplated that Burkhart would be unable to rent his land or sell his services if he failed to pay NFO. Thus, the district court erred in allowing the jury to award Burkhart damages for his lost brokerage commissions and missed business opportunities.
 
 
 36
 In regard to damage to credit, Burkhart testified that he had lost credit with several businesses after the Kinsley Bank dishonored his $75,000 check. He also introduced several letters from financial institutions refusing to lend him money. But he offered no evidence of the value of the damages he sought. "In order for the evidence to be sufficient to warrant recovery of damages there must be some reasonable basis for computation which will enable the jury to arrive at an approximate estimate thereof." Venable v. Import Volkswagen, Inc., 214 Kan. 43, 50, 519 P.2d 667, 674 (1974). Although absolute certainty is not required, there must be sufficient proof so that the jury is guided by some rational standard. Shultz v. Edwards, 3 Kan.App.2d 689, 690, 601 P.2d 9, 10 (1981). Burkhart offered no basis for calculating damages to credit. Thus there is no evidence to support such damages.
 
 C
 
 37
 While the bank declares that the "incidental" damages are questionable, it does not make an argument that they are unsupported by the evidence. We believe these are properly allowable. See Butler v. Westgate State Bank, 226 Kan. 581, 602 P.2d 1276, 1279 (1979). From our examination of the record the incidental damages appear to total $10,901.08 (Pl. exh. B-19). If there is any question this should be determined by the district court on remand.
 
 III
 
 38
 In his cross-appeal, Burkhart contends that the district court erred by refusing to give the jury an instruction on fraud. "Actionable fraud includes an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or recklessly made with disregard for the truth, where another party justifiably relies on the statement and acts to his injury and damage." Nordstrom v. Miller, 227 Kan. 59, 65, 605 P.2d 545, 551-52 (1980). Apparently Burkhart is arguing that Allison misrepresented his intent at the time the contract was made. The Kansas Supreme Court explained in Gonzalez v. Allstate Insurance Co., 217 Kan. 262, 265, 535 P.2d 919, 922 (1975), that misrepresentation of intent may constitute contractual fraud:
 
 
 39
 "Although contractual fraud requires the false representation of a material existing fact, rather than a promise of something to be done in the future, an exception exists when the promissor has no intention of carrying out the promise at the time it is made. Under those circumstances the promissor's intent is the existing fact which is fraudulently misrepresented."
 
 
 40
 Fraud, though, is never presumed and must be proved by clear and convincing evidence. Nordstrom v. Miller, 227 Kan. 59, 65, 605 P.2d 545, 552 (1980). Burkhart presented no evidence to prove that Burkhart intended not to carry out his promise at the time he made it. Thus, the district court did not err in refusing Burkhart's requested instruction on fraud.
 
 
 41
 Burkhart also claims that the district court erred in refusing his requested instruction on punitive damages.
 
 
 42
 "Damages for breach of contract are limited to pecuniary losses sustained and exemplary or punitive damages are not recoverable in the absence of an independent tort. Temmen v. Kent-Brown Chevrolet Co., 227 Kan. 45, 605 P.2d 95 (1980). This exception to the rule of unavailability of punitive damages in breach of contract actions is recognized when some independent tort or wrong results in additional injury which justifies the assessment of punitive damages by way of punishment of the wrongdoer. In such a case the proof of the independent tort must indicate malice, fraud, or wanton disregard for the rights of others."
 
 
 43
 Guarantee Abstract & Title Co., Inc. v. Interstate Fire and Casualty Co., Inc., 232 Kan. 76, 78, 652 P.2d 665, 667 (1982). There was no evidence of an independent tort in this case. Thus, the district court did not err in refusing to instruct the jury on punitive damages.
 
 
 44
 We are not impressed with Burkhart's argument that the bank's dishonor of his check justified an instruction on punitive damages. The other arguments in the cross-appeal need not be considered in view of our resolution of the other issues discussed in this opinion.
 
 
 45
 AFFIRMED in part, REVERSED in part, and REMANDED for proceedings in accordance with this opinion.
 
 
 
 [1]
 All parties presently involved in these appeals are residents of Kansas. The initial suit, however, was brought by the National Farmers Organization, Inc. (NFO), an Iowa corporation, as sole plaintiff. The parties were realigned after Kenneth Burkhart obtained a discharge of his debts in bankruptcy. NFO obtained judgment against the Kinsley Bank and was an appellee and cross-appellant in this court until it settled with the bank. No one raises a jurisdictional issue and we see none because diversity jurisdiction "depends upon the state of things at the time of the action brought" and "after vesting, cannot be ousted by subsequent events." Mollan v. Torrance, 22 U.S. (9 Wheat.) 537, 539, 6 L.Ed. 154 (1824). See also Johnston v. Cordell National Bank, 421 F.2d 1310, 1311 (10th Cir.1970)
 
 
 [2]
 The court's instruction contained an additional sentence, as follows:
 "That is not to say that the Kinsley Bank's loan limits are irrelevant: a bank's loan limits and the practice of correspondent banking should be considered by you, the jury, as part of the circumstances in evidence in this case."
 
 
 [3]
 Kan.Stat.Ann. Sec. 9-2001 makes it a misdemeanor for any banker, officer, employee, director or agent of a bank to fail to perform a duty required by the banking statute
 
 
 [4]
 Burkhart contracted with NFO for delivery of 15,000 to 20,000 lambs. Apparently 18,131 were offered for delivery and NFO and Burkhart used this figure in estimating damages
 
 
 [5]
 Burkhart's figures do not balance. The purchase price for 18,131 Colorado lambs was $865,962.31. In calculating his profit on the Texas lambs, he subtracted $260,165.50 as the cost of the lambs. In calculating his lost profit on the Colorado lambs, he subtracted $389,115.12 as the cost of the lambs. He testified that he would have paid the Kinsley Bank $198,523.50 after he sold the heavy Colorado lambs at a loss. Those figures add up to $847,804.12. He failed to account for the remaining $18,158.19 of the original purchase price of $865,962.31
 
 
 [6]
 Burkhart testified to an original purchase price of $865,962.31 for the 18,131 lambs. If he was correct that $389,115.12 would be the cost attributable to the half of the lighter lambs he would have fed out and then sold for a total profit of $17,595.74, he necessarily would have lost $17,978.19 on the sale of 9,065 heavier lambs he would have sold. (He calculated a sales price of $458,869 for the heavier lambs; necessarily their cost would be $476,847.19 [$865,962.31 less $389,115.12 attributable to those he was going to feed out]. Thus the net loss attributable to the two transactions would be $382.45
 
 
 [7]
 We offer no opinion on whether Burkhart's and Spaeth's testimony would have been sufficient to prove lost profits if they had testified that Burkhart would have made a profit on the Colorado lambs. The evidence necessary to prove lost profits with reasonable certainty depends on the facts of each case. Vickers v. Wichita State University, 213 Kan. 614, 618, 518 P.2d 512, 515 (1974)