189 N.J. Super. 242 (1983)
459 A.2d 1201
DSK ENTERPRISES, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
UNITED JERSEY BANK, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 19, 1983.
Decided May 6, 1983.
*244 Before Judges MICHELS, PRESSLER and TRAUTWEIN.
Kenneth G. Poller argued the cause for appellant (Wurtzel & Poller, attorneys).
William C. Rindone, Jr., argued the cause for respondent (Liebowitz, Liebowitz & Clark, attorneys).
The opinion of the court was delivered by PRESSLER, J.A.D.
Defendant United Jersey Bank (UJB) appeals from a judgment of the Chancery Division rescinding an assignment of a foreclosure judgment made by it to plaintiff, DSK Enterprises, Inc. (DSK). We reverse.
In view of the nature of the issues here raised, a detailed explication of the facts of this controversy is required. The property which was the subject of the original foreclosure action is a single-family residence in Bergenfield, New Jersey, purchased in June 1973 by Joseph and Bettye Hagins, husband and wife. They conveyed to Bettye Hagins about a month later. During the following eight months three separate mortgages were purportedly executed by Mr. and Mrs. Hagins in favor of UJB, securing an aggregate debt of approximately $51,000. Payments on the mortgage debts soon fell into arrears, and UJB in due course instituted a foreclosure action. At some unspecified time during its pendency Mr. Hagins obtained separate legal representation for Mrs. Hagins, retaining on her behalf in the foreclosure action the same lawyer who apparently had or was in the process of handling his business bankruptcy. Mr. *245 Hagins was represented in the foreclosure action by a different firm, and there is nothing in the record to suggest that at the time these arrangements were made, UJB had any reason to know of the apparent conflict of interest on the part of Mrs. Hagins' attorney. In any event, an answer was filed on behalf of Mrs. Hagins in the foreclosure action challenging the validity of the mortgages on the ground that her signature had been forged on all three mortgage instruments.
Insofar as we can determine from the record, extensive discovery ensued and settlement negotiations were undertaken between UJB and the Haginses. Mrs. Hagins, it appears, was aware of these negotiations and at least to some extent participated in them, relying, however, on her husband to protect her interests. It further appears that in August 1976 an initial settlement was reached whereby the Haginses agreed to pay UJB $20,000 by way of full satisfaction of the mortgage debt, $11,000 upon execution of the agreement and $9,000 within 90 days thereafter. Both Mr. and Mrs. Hagins and Mrs. Hagins' attorney signed a stipulation of settlement so providing.
This settlement apparently aborted due to the Haginses' inability to make the initial payment, and negotiations were resumed. A second settlement was reached in January 1977, and this time it was placed on the record in a Chancery Division proceeding. The terms of this settlement included an undertaking by the Haginses to pay UJB the sum of $20,000 within 2 1/2 weeks, Mrs. Hagins' attorney representing that a loan on their behalf had been negotiated which would provide the funds necessary for the payment. It was further agreed that if the settlement was not timely consummated "the defendants here are waiving their right to trial in the matter and the plaintiff may proceed by affidavit." We are satisfied that this proviso was understood and intended by all parties to mean that UJB was accorded the right to have a foreclosure judgment entered in the amount of the original mortgage debt. Neither Mrs. Hagins nor her attorney was present when the settlement was *246 placed on the record. At the outset of the hearing Mr. Hagins' attorney advised the judge that
... there is just one thing I would like the record to reflect at the representation of Mr. Joseph Hagins who is here  his wife is not here  and he advises me that I am authorized for Mrs. Hagins to put the settlement on the record although she had other counsel at some time.
Mr. Hagins, who was in court, was then questioned by the judge and was asked by him if he was indeed "authorized to speak for your wife to put this settlement on the record." The answer was in the affirmative, the case was marked settled by the court, and a form of order so indicating was entered.
The Haginses did not, however, comply with the obligations imposed upon them by the settlement and, after a lengthy period of forebearance by UJB during which further settlement negotiations were unsuccessfully conducted, UJB finally availed itself of its right under the terms of the settlement agreement to seek entry of final judgment of foreclosure on affidavit. The judgment was entered on July 5, 1978, fixing the mortgage debt as $51,843.53 plus interest.
At some unspecified time thereafter Mrs. Hagins retained her present attorney, who on her behalf obtained numerous postponements of scheduled sheriff's sales and attempted to reinstitute negotiations with UJB on her behalf. In the meantime, the various notices of sheriff's sale were published. Sometime prior to January 16, 1979 they came to the attention of one Stuart Hoff.
Hoff had a standing business arrangement with plaintiff corporation DSK. DSK was in the business of purchasing unsatisfied judgments at discount and Hoff, neither a stockholder, officer nor employee of DSK, received a commission on the business he recommended to DSK. Concluding from the notice of sale that the underlying foreclosure judgment represented a potentially worthwhile business opportunity for DSK, Hoff undertook negotiations with UJB for its purchase. A consideration of $34,000 was finally agreed upon for an assignment of the judgment from UJB to DSK, Hoff being of the view that *247 despite the inherent risks involved in purchasing a pre-sale foreclosure judgment, the "spread" between the consideration and the judgment amount provided a sufficient "cushion" to justify the speculation.
Prior, however, to the consummation of the assignment agreement, Hoff retained the services of an experienced title searcher, who was also the agent for a leading title insurance company, to advise him regarding the validity of the foreclosure proceedings. The searcher went to the offices of UJB's then attorney where he was given the entire and voluminous foreclosure file to review at his leisure and in privacy. It appears clear that had the searcher reviewed the file for content, he could not have failed to see that Mrs. Hagins had originally defended on the forgery claim. Viewing his role more narrowly, however, he did not read her answer or review the discovery files but rather confined his study to determining the facial regularity of the proceedings, including such matters as joinder and service upon all necessary parties. In any event, he reported to Hoff that the proceedings appeared regular on their face. Hoff was then satisfied to proceed, and the assignment was consummated by execution of the document and payment of the consideration on January 16, 1979. The instrument of assignment expressly provided that it was "without recourse, and assignor does not guarantee payment of the Judgment hereby assigned."
The sheriff's sale of the premises had been finally scheduled for January 17, 1979, the day after the assignment. On that morning Mrs. Hagins' current attorney called UJB's attorney. Their previous communications had involved only settlement conversations wherein Mrs. Hagins' attorney was attempting to work out with UJB some arrangement which would permit his client to keep the house.[1] The purpose of the January 17, 1979 telephone call was, however, quite different. Mrs. Hagins' *248 attorney advised UJB's attorney that he was filing a complaint that day seeking to set aside the foreclosure judgment. He further advised that he would that day seek an order to show cause why the sale should not be restrained. He did in fact so proceed, and the sale was restrained. DSK then instituted this action for rescission against UJB. The actions were consolidated for trial.
The evidence adduced at trial, hereinabove summarized, was essentially undisputed. UJB also stipulated that Mrs. Hagins' signature on the original three mortgages had been forged.
With respect to Mrs. Hagins' action, the trial judge held that she had neither authorized nor accepted the January 1977 settlement and could not be bound thereby. He further held that she was not obligated to UJB on the original mortgages since she, as the sole owner of the property, had not herself encumbered it. He, therefore, vacated the final judgment of foreclosure. Nevertheless, presumably as a matter of equity and based on what he perceived to be her proffer of judgment, he declared a lien on the property in favor of UJB in the amount of $20,000,[2] which he ultimately directed be discharged by Mrs. Hagins over a five-year period. There is no appeal from the judgment accordingly entered in Mrs. Hagins' action.
The appeal before us is only from the trial judge's disposition of DSK's rescission action. He ordered rescission, as we have noted, based on his conclusion that UJB had committed equitable fraud. This conclusion was in turn based on his finding that UJB had made a tacit representation to DSK, upon which DSK relied and had a right to rely, that the foreclosure judgment it was assigning was valid when in fact it was not. Apparently the judge was of the further view that UJB was affirmatively obliged to advise DSK that a forgery defense had been raised by Mrs. Hagins and that the validity of the judgment was thereby impugned. Our careful review of this record persuades us, *249 however, that there is no legal or factual support therein for a finding of equitable fraud.
To begin with, Mrs. Hagins' raising of the defense of forgery is in our view completely irrelevant to the validity of the settlement made in open court and the consequent judgment of foreclosure based thereon. Her liability to UJB on the mortgage loans had not up to that point been adjudicated and it may well have been that she would ultimately have been held liable despite the forgery. It is not beyond the realm of possibility that she could have been found to have authorized the signing of her name to the mortgages by another, or that she knew of the execution of the mortgages and ratified them, or that the entire transaction starting with the conveyance to her of the property and its use as security for loans in a manner which would ultimately insulate her from liability and protect the property from foreclosure was a plan conceived and executed with her knowledge and participation. It further appears that although UJB stipulated the forgery in these proceedings, the fact of the forgery had not, prior to the settlement, been adjudicated. It might also be that Mrs. Hagins, innocent of any contemporaneous knowledge, came to learn of the circumstances pursuant to which the forgery was made and was motivated, in foregoing her forgery defense, to protect others from criminal or civil liability. Our purpose in these observations is not to suggest that Mrs. Hagins or anyone else committed an act of fraud or other misconduct, but only to point out that typically a risk of exposure and vulnerability inheres in the litigation process and that its course is frequently influenced by extraneous considerations which are not always articulated or apparent. There was, therefore, absolutely nothing exceptionable in the apparent circumstance of Mrs. Hagins having decided to enter into the January 1977 settlement in lieu of continuing to prosecute her defense to the foreclosure action. It is also perfectly clear that had she actually authorized the settlement, as was represented by an attorney-at-law in open court, the consequent judgment would have been impregnable.
*250 The question then, on its first level, is whether there is anything in this record which would justify a finding that UJB knew or should have known that the representation made by the attorney at the settlement proceeding regarding Mrs. Hagins' authorization of the settlement was false. Clearly, absent such a finding, there could have been no misrepresentation by UJB. We perceive, moreover, absolutely nothing supportive of any such conclusion. The Chancery Division judge himself was satisfied to accept that representation. Moreover, UJB knew that Mrs. Hagins had been participating in the action and that both she and her own attorney had several months earlier signed a stipulation of settlement containing terms not too different from those placed orally on the record. UJB's reliance on the settlement proceedings was, therefore, not unreasonable. Nor is there anything to suggest that it acted with anything but good faith in procuring the entry of judgment when the settlement failed by reason of the Haginses' default. Insofar as it was then chargeable with knowledge, it had a good and valid judgment complete and regular on its face. That the judgment thereafter turned out to have been voidable and was actually voided because of the later adjudication that the settlement had not been authorized does not mean either that it was void when entered or that UJB should have anticipated its voidability as a result of an action to be commenced some six months later. Indeed, the record leaves no question of the fact that UJB's first notice that the judgment was going to be challenged came the day after consummation of the assignment when its attorney was so advised by Mrs. Hagins' attorney. Hence, insofar as we can determine from this record, there was no misrepresentation by UJB to DSK, tacit or otherwise, regarding the quality of the judgment. It was not void but only voidable and, moreover, voidability of a judgment pursuant to R. 4:50-1 for reasons dehors the record is a risk inherent in all unsatisfied judgments.
Not only do we conclude that there was no misrepresentation by UJB which could support a finding of equitable *251 fraud on its part but we also conclude that even if there were a tacit misrepresentation or a wrongful withholding of information regarding the prosecution of the foreclosure action, DSK did not rely thereon in concluding this transaction. Obviously, absent reasonable reliance by the complaining party, there can be no actionable equitable fraud. See, generally, Jewish Center of Sussex Cty. v. Whale, 86 N.J. 619 (1981). And see, also, Prosser, Law of Torts (4 ed. 1971), § 108 at 714-720.
The undisputed circumstances here preclude a finding of reasonable reliance by DSK. First, it was DSK itself which solicited and initiated the assignment. More significantly, it sent an expert to review the entire foreclosure file and it patently relied on his evaluation of validity, not UJB's. Moreover, the assignment itself, by being made without recourse and without guarantee of payment of the judgment, could not but have alerted DSK that it was proceeding at its own risk. DSK chose to take the risk, relying on its own business judgment and the expert opinions of its agents. Thus, there can be no doubt that even if DSK were to have had the right to have relied on any tacit representation of UJB, it did not in fact so rely. Thus, we find fully applicable here the principle that if a party to whom representations are made nevertheless chooses to investigate the relevant state of facts for himself, he will be deemed to have relied on his own investigation and will be charged with knowledge of whatever he could have discovered by a reasonable investigation. Berger v. Harrison Improvement Co., 108 N.J. Eq. 558, 561-563 (Ch. 1931). See John Hancock & c. Ins. Co. v. Cronin, 139 N.J. Eq. 392, 397-398 (E. & A. 1947); Froehlich v. Walden, 66 N.J. Super. 390, 395 (Ch.Div. 1961). Under these circumstances, UJB was not obliged to reiterate to DSK the information which was in its files and which it had turned over to DSK's agent for examination and review. There is, furthermore, nothing in this record to suggest that the misrepresentation here was of a character susceptible to reasonable reliance. The nature of the misrepresentation, insofar as we understand *252 the trial judge's findings, was that the foreclosure judgment had been validly entered. This is a representation in the nature of an opinion of quality. Reliance, however, on such an assertion is not justified as a matter of law unless the assertion is made by one who is in a position of trust and confidence to the recipient and the recipient's reliance thereon is reasonable, or unless the recipient of the assertion reasonably believes that the person making it has special expertise, or unless the recipient of the assertion is particularly susceptible to the type of misrepresentation involved. See 1 Restatement Contracts 2d, §§ 168, 169 at 455, 459 (1981). Cf. Judson v. Peoples Bank and Trust Co., 25 N.J. 17, 25-26 (1957); Gordon v. Schellhorn, 95 N.J. Eq. 563 (Ch. 1924). We are satisfied that the assertion or, more accurately, the nonassertion, here did involve an expression as to quality and that none of the special factors justifying reliance on such an assertion are present. To the contrary, DSK is in a high-risk, high-profit business. It purchased this judgment for approximately 60% of its face value. Had the judgment been collectible, DSK would have realized a minimum of a $20,000 profit on a $34,000 investment. The risk it took, virtually by its own admission, was the risk of noncollectibility. Considering that this was a foreclosure judgment complete and regular on its face, secured, as it were, by property having an equity in excess of the full face amount of the judgment, we are of the view that the ultimate and inherent collectibility risk was more likely to be an unanticipated flaw in the proceedings than based on any other circumstance.
As we read the trial judge's opinion, it is perhaps construable as suggesting that there is, on the sale or assignment of a judgment, an implied warranty that the judgment is genuine and is what it purports to be. This issue has not been considered in this jurisdiction although addressed elsewhere. See, e.g., Emerson v. Knapp, 75 Mo. App. 92, 97 (Ct.App. 1898); Miller v. Dugan, 36 Iowa 433 (Sup.Ct. 1873); Scofield v. Moore, 31 Iowa 241 (Sup.Ct. 1897); Thompson v. First State Bank, 102 Ga. 696, 29 S.E. 610, 611 (Sup.Ct. 1897); King v. Miller, 53 Or. 53, 97 P. *253 542 (Sup.Ct. 1908); Camp Mfg. Co. v. Durham Fertilizer Co., 150 N.C. 417, 64 S.E. 188 (Sup.Ct. 1909); Binswanger v. Hewitt, 79 Misc. 425, 140 N.Y.S. 143, 145 (Sup.Ct. 1913), app. den. 160 App.Div. 936, 145 N.Y.S. 1113 (App.Div. 1914); Hall v. Mathewson, 192 Wash. 651, 74 P.2d 209 (Sup.Ct. 1937). It appears that even where such an implied warranty is recognized, it is generally nevertheless deemed waivable. We do not, therefore, address the question as to whether or not there is any implied warranty in an assignment of a judgment since we find from the surrounding circumstances here and the language of the assignment itself, that even if there were, it was in any event here waived by the assignee. In short, we are satisfied that the nature of the transaction here between DSK and UJB, under all of the circumstances thereof, dictates the application of the doctrine of caveat emptor, despite the apparently growing disfavor in the law of that doctrine.
The judgment appealed from, insofar as it rescinds the assignment of the foreclosure judgment made by defendant United Jersey Bank to plaintiff DSK Enterprises, Inc., is reversed. We remand to the trial court for modification of the judgment by substituting DSK Enterprises, Inc. in place of United Jersey Bank as the lienee to whom plaintiff Bettye Hagins in the consolidated action is obligated.
NOTES
[1] By this time Mr. Hagins had long since been out of the picture. He had gone through bankruptcy, had apparently at some point been incarcerated and had thereafter disappeared.
[2] It is plain from Mrs. Hagins' trial testimony that she was aware that there was to be a $20,000 cash settlement which her husband was to pay.