**AMOCO PRODUCTION COMPANY, a Delaware corporation, Plaintiff,**

**v.**

**HUGOTON ENERGY CORPORATION, a Kansas corporation, Defendant.**

**Civil Action No. 95–1474–MLB.**

United States District Court, D. Kansas.

March 25, 1998.

David E. Bengtson, Robert J. O'Connor, Morrison & Hecker L.L.P., Wichita, KS, for Plaintiff.

Ralph R. Brock, Robert W. Coykendall, Donald E. Schrag, Richard D. Greene, Morris, Laing, Evans, Brock & Kennedy, Chtd., Wichita, KS, for Defendant.

## CIVIL ACTION

BELOT, District Judge.

### MEMORANDUM AND ORDER

Before the court are cross-motions for summary judgment (Docs. 86 & 88). The parties have filed several other documents in support or opposition (Docs. 87, 89, 92, 96, 97 & 98). For the reasons stated below, the court grants Hugoton Energy Corporation's motion (Doc. 88) and denies Amoco Production Company's motion (Doc. 86).

## I. NATURE OF THE CASE

This diversity action arises from the alleged breach of a contract created to promote oil exploration on land leased by Amoco. The court has jurisdiction under 28 U.S.C. § 1332(a).

## II. STANDARDS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of genuine issues of material fact. *Martin v. Nannie & the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir. 1993). "A fact is 'material' only if it might affect the outcome of the suit under the governing law." *MacDonald v. Delta Air Lines, Inc.,* 94 F.3d 1437, 1440 (10th Cir.

1996) (quoting other sources). In appropriate circumstances, the movant may be able to meet this burden by informing the court of the basis for its motion, *Martin,* 3 F.3d at 1414, but without supporting "its motion with affidavits or other similar materials negating the opponent's claim," *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986).

Once the moving party properly supports its motion, the nonmoving party "may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Muck v. United States,* 3 F.3d 1378, 1380 (10th Cir.1993). "Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " *Aldrich Enters., Inc. v. United States,* 938 F.2d 1134, 1138 (10th Cir.1991) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d at 273).

Summary judgment proceedings aim "to isolate and dispose of factually unsupported claims or defenses." *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2553, 91 L.Ed.2d at 274. The court's task is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 213 (1986). This requires the court to view the evidence in the light most favorable to the non-moving party. *See Thrasher v. B & B Chem. Co.,* 2 F.3d 995, 996 (10th Cir. 1993). Summary judgment is inappropriate if there is sufficient evidence on which a trier of fact could reasonably find for the nonmoving party. *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 684 (1991). These same standards must be applied individually to each motion for summary judgment facing the court. *Howell v. United States,* No. 95–5093, 1996 WL 153890, at *3,

81 F.3d 172 (10th Cir. Apr.3, 1996) (unpublished).

### III. SUMMARY OF FACTS[1]

This case arises from Amoco's desire to explore the oil and gas potential of certain of its leased properties in Stanton, Haskell, Finney, Seward, and Morton counties.[2] The mechanism Amoco used to accomplish that end was a Farmout Contract. The entity with which it contracted was Dolomite Resources Corporation. Subsequently, Hugoton Energy Corporation assumed Dolomite's rights and obligations under the contract. In order to place the remaining facts in context, the court will first review the key features of the Farmout Contract.

### A. EXPLORATORY TEST WELLS

The contract, executed May 7, 1990, generally divided Amoco's leaseholds into ten nine-section tracts called "Drilling Blocks." For illustrative purposes, refer to the following graphic.

| 1 | 2 | 3 |
|---|---|---|
| 4 | 5 | 6 |
| 7 | 8 | 9 |

**Drilling Block**

Within each of the ten Drilling Blocks, the contract allowed Hugoton to drill one Exploratory Test Well ("ETW") in the location of its choice. If and only if an ETW failed to produce oil or gas in commercial quantities, the contract granted Hugoton the right to spud an additional ETW. Hugoton could drill the additional well anywhere within the same Drilling Block, but it had to commence drilling within 120 days from the date it ceased drilling on the prior failed attempt.

The contract conferred two benefits to Hugoton upon drilling an ETW capable of producing commercial quantities of gas or oil.

First, the contract entitled Hugoton to an assignment of all or part of Amoco's leasehold acreage in the *section* of the Drilling Block where the ETW was located (Farmout Contract § 15.1, Doc. 87, Ex. A, p. 13). If the ETW was a gas producer, Hugoton earned the full section (*id.* § 15.1(a)). If it was an oil producer, Hugoton earned only the underlying quarter section (*id.* § 15.1(b)). In either case, the contract authorized Amoco to retain a nonconvertible 5.5% overriding royalty interest ("ORRI") in the oil or gas produced from the assigned acreage (*id.* § 15.1(a) & (b)). The second benefit Hugo-

---

1. On March 12, 1998, the court mailed the parties a draft copy of its summary of the facts, and directed the parties to identify material facts that needed to be added, as well as any factual errors that needed to be corrected. The parties subsequently responded (Docs. 99 & 100). The facts presented here are nothing more than the draft facts as modified to reflect some of Amoco's complaints and suggestions. Because none of Hugoton's suggested additional facts was material to the court's resolution of the case, the court has elected not to incorporate them.

2. Amoco objected to the draft form of this sentence, which included the adverb "inexpensively" modifying the verb "explore." Amoco's posi-

tion was that there was no record support for the court's characterization of Amoco's intent in entering the Farmout Contract. While the court cannot speculate on Amoco's subjective motive for deciding to explore its leaseholds through the vehicle of a Farmout Contract, the court can determine what the parties intended the contract to accomplish, *Akandas, Inc. v. Klippel*, 250 Kan. 458, 464, 827 P.2d 37, 44 (1992). Based on a review of the Farmout Contract, the court finds that Amoco's intent was to explore its leaseholds and to obtain geological information, while avoiding the actual risk and expense of drilling. *See Moncrief v. Louisiana Land & Exploration Co.*, 861 P.2d 500, 503–04 (Wyo.), *withdrawn for other reasons*, 861 P.2d 516 (1993).

ton gained by drilling a commercially successful ETW was the right to drill Development Test Wells ("DTWs") (*id.* § 5, p. 6).[3]

## B. DEVELOPMENT TEST WELLS

The Farmout Contract does not explicitly define the term Development Test Wells. It does make clear, however, that a DTW must be drilled in the same Drilling Block as a successful ETW (Farmout Contract § 5, Doc. 87, Ex. A, p. 6). Additionally, the first DTW in a Drilling Block must be drilled within 180 days of rig release on the ETW. The contract authorizes the drilling of subsequent DTWs so long as drilling commences within 180 days of rig release on any other DTW in the Drilling Block (*id.*).

As with successful ETWs, Hugoton could earn assignments of leasehold acreage by drilling DTWs capable of producing oil or gas in commercial quantities (Farmout Contract § 15.1, Doc. 87, Ex. A, p. 13). The contract

clearly limited the territory upon which Hugoton could earn assignments of leasehold acreage through the drilling of DTWs. The nature of the limitation depended on whether the ETW for the respective Drilling Block produced gas or oil. If it produced gas, then the contract required Hugoton to designate for development one-half of the remaining governmental sections within the Drilling Block (Farmout Contract § 5, Doc. 87, Ex. A, p. 6). Hugoton had to make its designation within five days of rig release on the ETW and the contract limited Hugoton's discretion by requiring Hugoton to disperse the designated sections across the Drilling Block to the extent possible. Hugoton could only earn assignments on the designated sections. If the ETW produced oil, the Drilling Block was divided into ½ quarter sections and marked in a checkerboard pattern. Hugoton could earn assignments only from wells drilled on alternating eighty acre tracts. *Id.*

**Drilling Block:**
**Gas Producing ETW**

**Drilling Block:**
**Oil Producing ETW**

If Hugoton drilled a gas producing DTW on eligible unearned acreage, the contract entitled Hugoton to an assignment of *all* of Amoco's leasehold acreage in the *section* of the Drilling Block where the DTW was located (*id.* § 15.1(a)). If Hugoton drilled an oil producing DTW on eligible unearned acreage, the contract entitled Hugoton to an assignment of only the underlying ½ quarter section, configured as a stand-up 80 acre

tract (*id.* § 15.1(c)). In either case, the contract authorized Amoco to retain a 7.5% ORRI in the oil or gas produced from the assigned acreage (*id.* § 15.1(a) & (c)). In the case of an oil producer, the 7.5% ORRI was nonconvertible (*id.* § 15.1(c)). In the case of a gas producer, this interest was convertible at payout to a 20% working interest (*id.* § 15.1(a) & § 16).[4]

---

3. Throughout its objections to the court's summary of facts, including this sentence, Amoco repeatedly requests additions emphasizing and re-emphasizing that DTWs could only be drilled on unearned sections. The court sees no value in repetition, but has added a paragraph at the close of part III.B. clarifying this point.

4. If Amoco exercised its conversion right, the contract required Hugoton to execute an assignment in favor of Amoco for the twenty-percent working interest (Farmout Contract §.16, Doc. 87, Ex. A, p. 15).

The Farmout Contract does not expressly state that DTWs must be drilled on unearned acreage, or stated another way, that only wells drilled on unearned acreage may qualify as DTWs. The parties agree and the court finds, however, that the language of the section describing DTWs, coupled with the obvious exploration motive of the contract, requires such an interpretation.[5]

## C. DRILLING CLOCK

The time limits in the contract amounted to a use-it-or-lose-it provision. Hugoton's right to drill under the Farmout Contract, and therefore its opportunity to obtain assignments of Amoco's leaseholds, hinged on its prompt and continuous development of the Drilling Blocks. Failure to meet the 120/180 day deadlines ("the Drilling Clock") with respect to a particular Drilling Block would terminate Hugoton's right to drill any other wells on unearned acreage in that block. On the other hand, once Amoco assigned its leasehold rights to a tract, Amoco had no right under the Farmout Contract to restrict Hugoton's development of that tract. Wells drilled on previously earned acreage, not being ETWs or DTWs, were outside the terms of the contract. Thus, Hugoton could drill such wells without limitation.

**5.** In particular, the contract reads,

[Hugoton], for a period of one hundred and eighty days (180) days after the drilling rig has been released from an Exploratory Test Well ... shall have the option to commence the actual drilling of a first Development Test Well *at a legal location ... that complies with the hereinafter described well location pattern.*

\* \* \* \* \* \*

In addition, [Hugoton], for a period of one hundred and eighty (180) days after the drilling rig has been released from the first Development Test Well or a prior Development Test Well on the same Drilling Block, shall have the option to commence the actual drilling of an additional Development Test Well *that complies with the hereinafter described well location pattern.*

\* \* \* \* \* \*

Development Test Wells shall be drilled ... by governmental section [if the ETW produced gas] and in a checkerboard pattern by stand-up eighty (80) acre tracts [if the ETW produced oil].

## D. ADDITIONAL BENEFITS TO AMOCO

The contract required Hugoton to provide Amoco with a copy of all geological information it obtained in the course of its exploration and development of the Drilling Blocks (Farmout Contract § 8 & Ex. B, Doc. 87, Ex. A). Amoco could then use the information to guide its own development efforts in retained acreage.[6]

## E. OPERATIONS ON DRILLING BLOCKS 5 AND 10

This lawsuit arises out of Hugoton's activities in Drilling Blocks 5 and 10. The court has trimmed the facts provided by the parties to focus on the critical events.

In each of the two Drilling Blocks, Hugoton drilled ETWs that were commercial gas producers (Amoco Facts 3 & 19; Hugoton Facts 7 & 16). In Block 5, the ETW was called Ellsaesser # 1–23 (Amoco Fact 3; Hugoton Fact 7). In Block 10, it was Marquardt # 1–28 (Amoco Fact 19; Hugoton Fact 16). Amoco executed assignments on the underlying sections on June 4, 1991, and October 8, 1991, respectively (Amoco Facts 4 & 20; Hugoton Facts 8 & 17).

Within 180 days after drilling the first DTW in Drilling Block 5 (Dewell # 1–19) and within 180 days after drilling the ETW in Drilling Block 10 (Marquardt # 1–28), re-

(Farmout Contract § 5, Doc. 87, Ex. A (emphasis added).)

**6.** Although Amoco concedes that these facts are accurate, it complains that they are not supported by the record on the motions for summary judgment. Because Amoco concedes their accuracy, they require no record support. Additionally, the first sentence is merely a recitation of a contractual requirement to which the court has cited. The second sentence is a reference to the purpose of the provision. As noted in a previous footnote, the intent of the parties as determined from the terms of a contract is a question of law which the court may decide. A recognized purpose of farmout agreements is to facilitate the farmor's development of retained acreage. That Amoco held a similar intent is obvious from the contractual requirement that Hugoton turn over all geological information and from the contractual provision guaranteeing that Amoco would retain at least every other tract in a given Drilling Block.

spectively, Hugoton drilled a follow-up well in the section underlying the ETW in each of the two Drilling Blocks. In Block 5, the follow-up well was called Wright Trust # 1–23, drilled June 13, 1991. In Block 10, it was Marquardt # 2–28, drilled October 30, 1991. Because the follow-up wells were drilled in the same sections as the ETWs, Hugoton earned no additional assignment of acreage.

More than 180 days after drilling the first DTW in Drilling Block 5 (Dewell # 1–19), Hugoton drilled additional wells there. Similarly, more than 180 days after drilling the ETW in Drilling Block 10, Hugoton drilled additional wells there (Amoco Facts 11, 12, 13, 24 & 25; Hugoton Facts 13 & 19).[7] These later wells were drilled within 180 days of Wright Trust # 1–23 and Marquardt # 2–28, respectively (*id.*). Thus, the Drilling Clock expired prior to the drilling of these later wells unless either Wright Trust # 1–23 and Marquardt # 2–28 were DTWs under the terms of the written Farmout Contract or unless the parties otherwise agreed.

Both parties agree that neither Wright Trust # 1–23 nor Marquardt # 2–28 qualify as DTWs under the terms of the Farmout Contract as originally drafted, because they were drilled on previously earned acreage (Doc. 87 at 4, 17, 19, 23 & 24; Doc. 92 at 2).[8] Thus, as matters stood at the time of rig release, Amoco's rights in the two wells were limited to a nonconvertible 5.5% ORRI. Based on the following events and the language of the Farmout Contract, however, Amoco claims that the wells are DTWs, and therefore that Amoco is entitled to a 7.5% ORRI, convertible to a 20% working interest at payout.

## F. WRIGHT TRUST # 1–23 AND MARQUARDT # 2–28 CONSIDERED DTWs

On July 22, 1991, Amoco sent Hugoton a letter purporting to extend the drilling clock for a DTW on Drilling Block 5 to October 1 (Doc. 92, Ex. E). Hugoton responded in a July 29, 1991 letter, as follows:

Thank you for your letter of July 25, 1991 in which you granted us an extension of time to drill the next Development Well in [Drilling Block 5]. Your granting of such an extension however, actually operates to reduce the time already provided for in the agreement.

Drilling operations on the Wright Trust # 1–23 Development Well were completed on June 24, 1991. Pursuant to the terms of the Farmout Agreement, we were to have 180 days from rig release in which to spud the next Development Well. Therefore, we should have until December 21, 1991 in which to spud the next Development Well in [Drilling Block 5].

I am enclosing herewith a summary which indicates drilling deadlines in each [Drilling Block]. If for some reason you are not in agreement with any deadlines shown, please advise me immediately.

(Doc. 87, Ex. C.) Hugoton's deadlines for Drilling Blocks 5 and 10 reflected its belief that Wright Trust # 1–23 and Marquardt # 2–28 reset the Drilling Clock (*id.*, p. 2).

Amoco never objected to the deadlines recited by Hugoton in the July 29 letter or in any subsequent schedule submitted by Hugoton (Hugoton Facts 12, 13 & 19; Hugoton Add'l Fact 3). There is no indication that Amoco ever took any action to prevent Hugoton from sinking the later wells or to inform Hugoton that its rights under the Farmout Contract had expired as a result of its failure to meet the Drilling Clock, even though Amoco knew in advance the location and timing of all drillings (Hugoton Fact 13).[9] Meanwhile,

---

**7.** These wells will be referred to as the "later wells." Rig release on Hugoton's last DTW in Drilling Block 5 occurred October 2, 1993 (Amoco Fact 15). Rig release on Hugoton's last DTW in Drilling Block 10 occurred October 27, 1992 (Amoco Facts 28 & 30).

**8.** Indeed, neither party even argues that the Farmout Contract is ambiguous on this point.

**9.** The Farmout Contract required Hugoton to send Amoco copies of all forms and notices submitted to the Kansas Oil and Gas Conservation Commission of the Kansas Corporation Commis-

sion ("K.C.C.") (Farmout Contract § 8 & Ex. B § 7, Doc. 87, Ex. A). State law required Hugoton to file a notice of intention to drill prior to drilling any well, and prohibited any drilling until five or more days elapse after the K.C.C. has approved the notice. Kan.Admin.Reg. § 82–3–103(a)(1)(B) & (a)(2) (1997). The notices must identify the specific location of the proposed drilling site down to exact footages. *Id.* § 82–3–103(a)(3)(D); *see, e.g.,* Doc. 87, Ex. G at A004611.

Amoco continued to assign leased acreage to Hugoton for commercially successful later wells. As Amoco expressly concedes in its response to the court's summary of undisputed facts, Amoco failed to take any action and continued to make assignments "because ...

Amoco believed, at that time, that the Wright Trust # 1–23 and Marquardt # 2–28 were in fact DTWs" (Doc. 99 at 4–5).

The following time-lines add perspective to the chain of events described above:

## Drilling Block 5

## Drilling Block 10

As evidenced by the July 29, 1991 letter quoted above, the parties believed at the time that Wright Trust # 1–23 and Marquardt # 2–28 were in fact DTWs under the original terms of the Farmout Contract. At his deposition, Logan explained the July 29 letter, which he wrote on behalf of Hugoton, as follows:

Q. And you make reference to in the first paragraph to drilling the next development well. And you capitalized those words. And, again, that is a reference to the next development test well as defined under the farmout contract. Isn't that true?

A. That was my intent, yes.

Q. Then in the second paragraph, you acknowledge that the Wright Trust is a development test well within the meaning of the farmout contract, do you not?

A. Yes.

(Logan Depo., p. 165.) Logan had been under the impression that the wells were DTWs all along (Logan Depo. at 140, Doc. 87, Ex. E).

The parties' maintained their mutual belief that the two wells were DTWs under the terms of the original Farmout Contract deep into 1994. In a letter to Amoco dated August 12, 1994, Hugoton wrote,

Whether or not the Wright Trust # 1–23 is classified as a "Development Test Well" makes little difference in the context of the contract. Nonetheless, I agree the Wright Trust # 1–23 is in fact a Development Test Well, as any well drilled subsequent to the first producer in a given prospect area [ (Drilling Block) ] is a "Development Test Well". The contract provides that "**in assignments for a Development Test Well** Amoco shall reserve a proportionate 7.5% of 8/8 convertible ORRI" (convertible to a 20% WI at payout). **The fact is, no assignment was due for the Wright Trust well because the acreage on which it was located had already been earned by the Ellsaesser # 1–23.** Nowhere in the contract does it say Amoco shall have a 7.5% convertible ORRI on Development Wells, only that **in assignments for Development Test Wells, it shall reserve it.** Further, unlike other Amoco agreements, this particular contract does not prohibit the drilling of Development Wells on acreage already earned nor does it say Development Wells must be situated on unearned tracts of acreage. It also does not limit the number of wells which can be drilled on earned tracts.

(Doc. 87, Ex. D (emphasis original).) Based on Hugoton's letters and Logan's deposition testimony, it is crystal clear that Hugoton, along with Amoco, considered Wright Trust # 1–23 and Marquardt # 2–28 to be DTWs within the meaning of the written Farmout Contract.

Given that understanding, the parties did not consider Hugoton's rights under the contract to have lapsed when Hugoton began drilling the later wells within 180 days after the drilling of Wright Trust # 1–23 or Marquardt # 2–28, respectively (Amoco Facts 10, 12, 25; Hugoton Fact 13). Accordingly, Hugoton continued to develop Drilling Blocks 5 and 10 (Amoco Facts 11, 13, 15; Hugoton Facts 12–14, 19). Two of the later wells, both in Drilling Block 5, were successful commercial gas producers (Hugoton Fact 14). In keeping with the provisions of the

Farmout Contract for DTWs, Amoco assigned its lease acreage in the underlying sections to Hugoton, reserving a convertible 7.5% ORRI (*id.*).

Hugoton has raised various equitable defenses to Amoco's claims. The following facts primarily bear on those issues:

## G. PAST EXTENSIONS OF THE DRILLING CLOCK

In the course of their relationship under the Farmout Contract, Hugoton requested and received several extensions of the Drilling Clock (Hugoton Add'l Fact 1). Amoco never requested or received additional consideration in exchange for these extensions. It implicitly benefitted from the extensions, however, because Amoco received low-risk, continued exploration of its leased acreage, with the possibility of obtaining royalties from productive wells, and avoided the expense of locating a new drilling partner (*id.*). With respect to the later wells, however, Hugoton did not request, and did not perceive the need to request, an extension.

## H. EQUITABLE CONSIDERATIONS

Amoco first communicated to Hugoton its claim to an increased interest in the sections underlying Wright Trust # 1–23 and Marquardt # 2–28 in mid–1994 (Hugoton Fact 27). In the intervening years, Colleen Kennedy of Amoco had repeatedly worked with Hugoton and Dolomite to correct ministerial matters in assignments covering the same acreage (*id.*). At the same time, Amoco continued to accept from Hugoton royalty payments, calculated at the 5.5% rate, on Wright Trust # 1–23 (Hugoton Add'l Fact 7).

In August of 1991, after Hugoton drilled Wright Trust # 1–23, Amoco sent Hugoton a form letter requesting payout statements on that well (Hugoton Add'l Fact 8). Amoco's Payout Desk was under the impression that a payout situation existed on Wright Trust # 1–23 (Hugoton Fact 15; Doc. 90, Tab I at A006418).[10] Amoco's own records reflect

---

10. The parties have not explained why the payout desk believed a payout situation occurred. Additionally, the payout desk appears to have been confused as to the terms of the Farmout Contract. Their records reported Amoco's interest in Wright Trust # 1–23 to be a 5.5% ORRI convertible to a 20% working interest at payout. Nowhere does the Farmout Contract provide for such a combination of interests.

that Jeff Logan of Hugoton spoke with Amoco by phone in June of 1992 and that Logan reported to Amoco that "the subject well was drilled on acreage earned by completing the Ellsaesser # 1–23, and that Amoco maintains an ORI in the subject well but has no reversionary option" (Hugoton Fact 15; Hugoton Add'l Fact 8; Doc. 90, Ex. I at A006418). Following that conversation, the payout desk closed its file on the matter (*id.*). None of the records held by Amoco's Property Administration, Division Order Section, or similar department have ever reflected Amoco's claim that it is entitled to a convertible 7.5% ORRI in the sections underlying Wright Trust # 1–23 and Marquardt # 2–28 (Hugoton Facts 23, 24 & 29).[11]

## IV. ANALYSIS

Amoco argues that the parties agreed to treat Wright Trust # 1–23 and Marquardt # 2–28 as DTWs, despite the fact that they did not in fact qualify as DTWs under the written Farmout Contract (Doc. 87 at 24). Amoco also argues that the Farmout Contract entitles Amoco to a convertible 7.5% ORRI in wells drilled on sections underlying DTWs (*id.* at 20). As a result, Amoco claims that it is entitled to two additional percentage points of ORRI, as well as conversion rights, on Wright Trust # 1–23 and Marquardt # 2–28 (*id.* at 23 & 27).

Overall, Amoco's argument is tightly focused and well written. Amoco carefully and methodically discusses the exploration motive behind the Farmout Contract (Doc. 87 at 15–17), the parties' rights and obligations under the contract (*id.* at 18–21), and the contract definition of a DTW (Doc. 87 at 22–23), then persuasively concludes that neither Wright Trust # 1–23 nor Marquardt # 2–28 fit the contract definition of a DTW. Amoco goes on to argue that the parties nevertheless agreed to consider the two wells to be DTWs (*id.* at 23–27). It is at the last step of the analysis that Amoco's argument fails.

Amoco begins by pointing out that Wright Trust # 1–23 and Marquardt # 2–28 were not DTWs as defined by the Farmout Contract as originally executed. At the same time, Amoco concedes that Farmout Contract

"accurately reflected the intent and agreement of the parties at the time" it was executed (Doc. 97 at 16). Amoco's contention is that subsequently, "the parties agreed that [Wright Trust # 1–23 and Marquardt # 2–28] would be treated as Development Test Wells under the Farmout Contract" (*id.*).

## A. AGREEMENT TO MODIFY

■ Amoco does not contend that the parties expressly agreed to characterize Wright Trust # 1–23 and Marquardt # 2–28 as DTWs within the meaning of the original Farmout Contract. Rather, Amoco says the existence of such an agreement is to be implied from the subsequent conduct of the parties (Doc. 87 at 14, 24 & 27), specifically, the simple fact that the parties referred to the wells as DTWs.

■ An agreement to modify a contract is itself a contract. *Frets v. Capitol Federal Sav. & Loan Ass'n*, 238 Kan. 614, Syl. ¶ 4, 620, 712 P.2d 1270, 1276 (1986); *Restatement (Second) of Contracts* § 29 (1981). "A contract implied in fact arises from facts and circumstances showing mutual *intent* to contract." *Mai v. Youtsey*, 231 Kan. 419, 422, 646 P.2d 475 (1982) (emphasis original); *see also Arrowhead Constr. Co. v. Essex Corp.*, 233 Kan. 241, Syl. ¶¶ 2 & 3, 248, 662 P.2d 1195 (1983) (requiring proof of meeting of minds and manifestation of intent to be bound); *Butler v. Westgate State Bank*, 3 Kan.App.2d 403, Syl. ¶ 1 & 2, 407–08, 596 P.2d 156, 161, *rev'd on other grounds*, 226 Kan. 581, 602 P.2d 1276 (1979) (same). *Cf. Restatement (Second) of Contracts* §§ 3, 17, 21 (requiring mutual manifestation of assent to exchange promises or performances, rather than an explicit intent to be legally bound) (1981). The record not only fails to support Amoco's argument of an implied contract, but refutes it. There is no evidence that either Hugoton or Amoco ever discerned a need for an agreement. In fact, Logan directly testified that he was under the impression that the wells were DTWs *all along* (Logan Depo. at 140, Doc. 87, Ex. E) Hugoton's letters, Logan's deposition, and Amoco's concession,

11. Amoco argues that its records were and are in error, and that the error cannot be corrected

until this case is decided.

conclusively demonstrate that the parties were simply laboring under the mistaken belief that the term DTW, as used in the original Farmout Contract, encompassed wells drilled on previously earned acreage. It was that mistake, rather than any agreement, that caused Amoco to allow Hugoton to continue developing Drilling Blocks 5 and 10 as though the drilling deadlines had not elapsed. Because there is no evidence that the parties manifested an intent to create a binding agreement, the court cannot find the existence of a modification contract.

■ In the course of its modification argument, Amoco cites *Heyen v. Hartnett*, 235 Kan. 117, Syl. ¶ 4, 123, 679 P.2d 1152 (1984), for the proposition that subsequent conduct "should be given great weight in determining the meaning of the contract." The rule in *Heyen* only comes into play, however, when the terms of a contract are ambiguous. *Taliaferro v. Taliaferro*, 260 Kan. 573, Syl. ¶ 12, 585, 921 P.2d 803, 812 (1996) ("The subsequent actions of the parties to a written instrument can be considered only to resolve ambiguity that appears on the instrument's face.") (citing *Heyen*, 235 Kan. at 122–23, 679 P.2d 1152). If a contract term is ambiguous, the parol evidence rule is suspended so that the court may receive extrinsic evidence, including subsequent conduct, bearing on the meaning of the ambiguous provision. Neither Amoco nor Hugoton asserts that the Farmout Contract is ambiguous with respect to whether a well drilled on previously earned acreage is a DTW. Both agree that such a well is not a DTW. Thus, the subsequent conduct rule of *Heyen* is not applicable to the question of whether the parties entered an agreement on how to treat Wright Trust # 1–23 and Marquardt # 2–28.

Amoco has failed to produce any competent evidence that the parties intended to modify the Farmout Contract by deeming Wright Trust # 1–23 and Marquardt # 2–28 to be DTWs. In the absence of such evidence, Hugoton is entitled to summary judgment on that claim.

## B. TRESPASS

■ The foregoing analysis reduces Amoco to its trespass claim. Amoco argues that because Wright Trust # 1–23 and Marquardt # 2–28 were not DTWs, Hugoton failed to comply with the Drilling Clock, resulting in a termination of Hugoton's rights to future exploration (Doc. 87 at 27–30). Thus, Hugoton was trespassing on Amoco's property when it drilled the later wells (*id.*). Amoco cites the cases of *Brinkman v. Empire Gas & Fuel Co.*, 120 Kan. 602, 245 P. 107 (1926), and *Dailey v. Joslin*, 172 Kan. 199, 240 P.2d 471 (1952), for support. Amoco's reliance on those cases is misplaced.

*Brinkman* was a suit by an oil and gas sub-lessee, such as Hugoton, against a lessee, such as Amoco. *Dailey* was a case by an oil and gas lessee against the property owner. In both cases the senior interest holder deemed the Drilling Clock to have expired and thereafter commenced its own drilling operations on the leased acreage. The junior interest holders sued arguing that the Drilling Clock had not run. In both cases, the junior interest holder prevailed. In *Dailey*, the court agreed with the lessee that the clock had not actually run. 172 Kan. at 210–11, 240 P.2d 471. In *Brinkman*, the court held that the clock had expired, but that the lessee had waived the sub-lessee's failure of performance. 120 Kan. at 608–09, 245 P. 107.[12] Neither case is helpful to Amoco.

■ There are two elements to the tort of trespass. The actor must have been (1) intentionally (2) on the property of another. *United Proteins, Inc., v. Farmland Indus., Inc.*, 259 Kan. 725, 729–30, 915 P.2d 80, 83 (1996) (quoting *Restatement (Second) of Torts* § 164 cmt. a (1963)). "Consent [however] is an absolute defense to an action for trespass." *Belluomo v. KAKE TV & Radio*, 3 Kan.App.2d 461, Syl. ¶ 2, 506 P.2d 832 (1979). Consent may be express or implied, and it may be implied from silence. *Turner v. Gilbreath*, 3 Kan.App.2d 613, Syl. ¶ 2, 616, 599 P.2d 323, 325 (1979). There can be no

---

12. In fact, the *Brinkman* court specifically noted that "[t]imely performance of an act to be performed as part of the consideration for a contract, may be waived. If the promisee waives, nobody else can complain. If the promisee does not waive, he must complain promptly." 120 Kan. at 608, 245 P. 107. This is consistent with *Restatement (Second) of Contracts* §§ 84 & 246 (1981).

question but that Amoco consented to the drilling of the later wells. Amoco received notice of Hugoton's continued drilling plans in the July 29, 1991 letter and it received advance notification before the drilling of each later well (Logan Depo. at 171, Doc. 92, Ex. B), it allowed Hugoton to continue drilling for more than fifteen months after rig release on Wright Trust # 1–23, and it assigned to Hugoton its leaseholds on the property underlying the two productive later wells. At no point did Amoco voice any objection to Hugoton's presence on its leased acreage. In short, Amoco's conduct, entirely consistent with its mistaken belief that Wright Trust # 1–23 and Marquardt # 2–28 were DTWs, amounted to implied consent. Thus, the only question is whether Amoco's consent, predicated on a mistake, was valid.

■ Absent fraud, misrepresentation, or duress, mistake will only negate consent if the erstwhile trespasser was aware that the consenter was laboring under a mistake.[13] *See Restatement (Second) of Torts §§ 167–75, 892B(2), & 892B cmt. c (1965 & 1979); 75 AmJur.2d, Trespass § 90 (1991).* "The fact that the mistake is mutual rather than unilateral to the plaintiff does not change the result so long as the actor does not know that the plaintiff is operating under the mistake." *Restatement (Second) of Torts § 892(B) cmt. c.* At some point before Hugoton began drilling the later wells, it presumably knew that Amoco considered Wright Trust # 1–23 and Marquardt # 2–28 to be DTWs. There is no evidence, however, that Hugoton knew that that belief was mistaken. Rather, it held the same mistaken view. In the absence of any evidence that Amoco's consent was invalid, summary judgment must be granted to Hugoton on Amoco's trespass claim.

**13.** There is no evidence that Amoco's consent was procured by fraud, misrepresentation, or duress. Misrepresentation is relevant if reasonably relied upon. The conduct or assertion upon which Amoco allegedly relied was Hugoton's statement that Wright Trust # 1–23 and Marquardt # 2–28 were DTWs within the meaning of the Farmout Contract. Hugoton's statement was its interpretation of how the contract applied to wells drilled on previously earned acreage. "[A] statement that is limited to the maker's opinion as to the legal consequences of a state of facts and does not amount to an assertion as to the facts themselves is an assertion of opinion only. This is particularly true if all of the facts are

## C. OTHER CLAIMS

According to both the pretrial order (Doc. 90, Ex. M, pp. 1–2) and Amoco's summary judgment memorandum (Doc. 87 at 4–5), Amoco has only two claims against Hugoton: breach of an alleged modification contract, or in the alternative, trespass predicated on breach of the original contract. Because the court grants summary judgment to Hugoton on both claims, there remains no issue for the trier of fact. Accordingly, judgment shall be granted on the whole case.

## V. CONCLUSION

For the reasons stated above, the court grants Hugoton's motion for summary judgment (Doc. 88) and denies Amoco's motion for summary judgment (Doc. 86). In light of the court's ruling, there is no reason to consider Hugoton's remaining arguments.

A motion for reconsideration is neither invited nor encouraged. Any motion for reconsideration must comply with Rule 7.3 of this court and the standards set out in *Comeau v. Rupp*, 810 F.Supp. 1172, 1174 (D.Kan.1992). They must be filed by Monday, April 3. The motion may not exceed five pages in length, including supporting arguments and authorities, regardless of the number of points raised. All responses must be filed by Monday, April 17. Responses shall be limited to four pages each. No replies may be filed. Motions for extension of these time periods will be viewed with disfavor. The filing of such a motion does not relieve the party of its obligation to meet the relevant deadline, even if the motion is

known to both parties or are assumed by both of them to exist." *Restatement (Second) of Contracts § 170 cmt. b (1981).* Thus, Hugoton's statement was an assertion of opinion.

A person may justifiably rely on an assertion of opinion only in unusual circumstances not present here. *See id. § 169 & cmt. e; see also Barrer v. Women's Nat'l Bank, 761 F.2d 752, 759 (D.C.Cir.1985) (citing Restatement (Second) of Contracts § 169); DSK Enterprises, Inc. v. United Jersey Bank, 189 N.J.Super. 242, 459 A.2d 1201, 1206 (1983) (same).* As a result, the court cannot find that Amoco reasonably relied upon Hugoton's statement.

not ruled upon prior to the expiration of the deadline.

IT IS SO ORDERED.